```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF KENTUCKY
                         CENTRAL DIVISION AT LEXINGTON


UNITED STATES OF AMERICA,       )
                                )
         Plaintiff,             )    5:09-CR-181-S
                                )    Lexington, Kentucky
      vs.                       )    May 3, 2012
                                )    10:57 a.m.
GARY MILBY,                     )
                                )    SENTENCING HEARING
         Defendant.             )



                        TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE KAREN K. CALDWELL,
                     UNITED STATES DISTRICT JUDGE



APPEARANCES:

FOR THE GOVERNMENT:        KENNETH TAYLOR
                           WADE NAPIER
                           Assistant United States Attorneys
                           Eastern District of Kentucky
                           110 West Vine Street, Suite 400
                           Lexington, KY  40507

FOR THE DEFENDANT          R. MICHAEL MURPHY, ESQ.
GARY MILBY:                JARROD J. BECK, ESQ.
                           Law Office of R. Michael Murphy
                           709 Mill Pond Road
                           Lexington, KY  40514

                           R. DAVID BAKER
                           Assistant Federal Public Defender
                           JENNIFER WILEMAN, Paralegal
                           Middle District of Tennessee
                           810 Broadway, Suite 200
                           Nashville TN  37203
```

```
 1   APPEARANCES:   (Continued)

 2   Court Reporter:              Rhonda S. Sansom, RPR, CRR
                                  Federal Official Court Reporter
 3                                U.S. District Courthouse
                                  101 Barr Street, Room 413
 4                                Lexington, KY   40507
                                  (859)619-3624
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by mechanical stenography, transcript
     produced with computer.
25
```

U. S. v. Milby, 5:09-CR-181-S
Sentencing Hearing (5/3/12)

3

1  (At 10:057 a.m. on May 3, 2012, with counsel for the
2  parties present, the following proceedings were had.)
3  THE HONORABLE KAREN K. CALDWELL:  Will the Clerk of
4  the Court please call the matter to come before the Court.
5  THE CLERK:  Yes, your Honor.  Lexington Criminal
6  Action No. 5:09-CR-181-S, United States of America versus
7  Gary Milby.  Called for sentencing.
8  THE COURT:  Will the United States make its
9  appearance for the record.
10  MR. TAYLOR:  Good morning, your Honor.  Ken Taylor
11  and Wade Napier for the United States.
12  THE COURT:  Mr. Taylor, Mr. Napier.
13  Counsel for the defense.
14  MR. MURPHY:  May it please the Court, Mike Murphy.  I
15  represent Gary Milby, your Honor.
16  Also, I'm joined by Mr. Jarrod Beck and Mr. David
17  Baker, who works in the Public Defender's Office in
18  Nashville, Tennessee.  He also represents Mr. Milby.  And his
19  paralegal, Jennifer Wileman.
20  THE COURT:  Counsel.
21  This matter has been scheduled for a sentencing
22  hearing.  As counsel is aware, Mr. Milby has taken ill.  I
23  understand, Mr. Murphy, that paralegals have come to -- or
24  paramedics have come to the courthouse to examine him and
25  have elected to take him to the hospital; is that correct?

1	MR. MURPHY: That is correct, your Honor.

2	THE COURT: Very well. In view of Mr. Milby's
3	current situation, I don't think it's going to be possible
4	for us to proceed with the sentencing hearing today, given
5	the nature of his condition.

6	Is there any objection to that, Mr. Murphy?

7	MR. MURPHY: No, I could agree, your Honor. Just
8	from personal experience with what is going to be taking
9	place, it's going to be several hours before we get any word
10	back about what's actually going on.

11	THE COURT: All right. Mr. Taylor, do you concur?

12	MR. TAYLOR: Well, that's the question I have, is
13	whether we're giving up on today as of this moment. That
14	will affect what the victims do with regard to speaking.

15	THE COURT: All right. Well, let me make two
16	suggestions. One, we can wait until we hear from Mr. Milby
17	and get a report regarding his ability to proceed, which of
18	course at this point we don't know what that's going to be.

19	Or I understand your victims have traveled a long
20	distance and would like to be heard, so to avoid any
21	inconvenience to them I could go ahead and hear from them
22	now, place their testimony on the record, make sure that that
23	is transcribed, presented to the defendant and his counsel,
24	and we can proceed with sentencing another day.

25	If you'd like to confer with the victims in this case

1 or with your cocounsel, I'll permit that.

2 MR. TAYLOR: We conferred extensively during the last
3 break. And as I understand it, if there's going to be a
4 chance that we reconvene, even in the middle of the
5 afternoon, for sentencing they would like to make their
6 statement with Mr. Milby present.

7 THE COURT: All right.

8 MR. TAYLOR: If we are giving up on this day and it's
9 definitely going to be another day, then they would then take
10 that substitute and put their testimony on the record.

11 So I guess we need to decide whether today is
12 salvageable at all. That's what they would prefer, but we
13 realize that --

14 THE COURT: I understand. And regrettably, having
15 spent many long days with grandchildren and children in
16 emergency rooms, one never knows what may happen. And of
17 course, given the complications of Mr. Milby's health
18 condition -- I know he's had several stents implanted, he has
19 heart problems, he has vascular problems -- I have no way of
20 predicting how long it will be.

21 If it would be of any assistance, we could recess
22 until 1:00. Mr. Murphy, maybe you would have a status report
23 by then, and then at 1:00 we could make a decision whether to
24 give up on the day or to go ahead and wait it out.

25 Does that seem like a reasonable solution,

Case: 5:09-cr-00181-KKC  Doc #: 501  Filed: 05/03/12  Page: 6 of 19 - Page ID#: 7902
U. S. v. Milby, 5:09-CR-181-S
Sentencing Hearing (5/3/12)

6

1  Mr. Taylor?
2    MR. TAYLOR:  I believe it does, your Honor.
3    THE COURT:  Mr. Murphy?
4    MR. MURPHY:  I agree, your Honor.
5    THE COURT:  All right.  So why don't we reconvene
6  here around 1:00.  You can get some lunch, and hopefully
7  we'll have some good news about Mr. Milby's health and we can
8  proceed.
9    All right.  We'll be in recess.
10   (Proceedings recessed at 11:01 a.m. until 1:10 p.m.)
11    THE COURT:  We will be back on the record in Criminal
12  Action No. 9-81, United States of America versus Gary Milby.
13  The Court will notice that all counsel are present.
14  Mr. Milby is not present due to health concerns.
15    Mr. Murphy, Mr. Taylor, I have had the United States
16  Marshal advise you regarding the status of the defendant's
17  health.  Do either of you have any suggestions for the Court
18  at this point?
19    MR. MURPHY:  I will defer to Mr. Taylor, your Honor.
20  I think he has a decision to make.
21    THE COURT:  All right.
22    MR. TAYLOR:  Well, it appears that Mr. Milby and the
23  doctors are having some disagreement.  Mr. Milby wants to
24  waive any liability and come be sentenced, and the doctors
25  are apparently trying to talk him out of that.

1  I don't know if he'll be successful waiving and
2  getting over here. And it doesn't look like, even if he
3  does, it's going to any time in the next few minutes. So I
4  believe today is just not going to be workable. I'll put it
5  that way.
6      THE COURT: It appears that a reasonable conclusion.
7  Therefore, what I am prepared to do, if you would like to
8  proceed this way, is to hear from victims who have traveled
9  to be heard by the Court at sentencing, hear from them now,
10 making a record of their comments, making sure that that
11 transcription is prepared so that not only Mr. Milby's
12 counsel will have the opportunity to see it but that
13 Mr. Milby will have the opportunity to see the testimony.
14 And then proceed with the sentencing hearing at the time that
15 Mr. Milby is physically able to participate.
16     Is there any objection, Mr. Murphy?
17         MR. MURPHY: No, your Honor.
18         THE COURT: Any objection, Mr. Taylor?
19         MR. TAYLOR: No, your Honor.
20         THE COURT: Very well. Mr. Taylor, I will permit you
21 to introduce the victims who would like to be heard by the
22 Court here today.
23         MR. TAYLOR: Thank you, your Honor. We have
24 Mr. and Mrs. Hallin here today. It's H-A-L-L-I-N. I will
25 let them decide who will speak first.

         Do you want them at the podium, your Honor?

         THE COURT: Please.

         MR. TAYLOR: All right.

         THE COURT: Ma'am, please come forward and be heard. Would you please state your full name and spell it for our court reporter.

         MRS. HALLIN: My name is Pamela Hallin. The last name is H-A-L-L-I-N.

         THE COURT: Mrs. Hallin, you may proceed.

         MRS. HALLIN: A lot of this is what happened after Milby, but it is all our story.

         Our Gary Milby nightmare began in August of 2004 and isn't over yet. Along with many other people, I was invited to an asset allocation seminar with a free dinner set up by Milby through three Memphis men whom he had paid. We believe one received $80,000, one received $28,000. And the other man we know nothing about, and he conveniently disappeared along -- sometime along the way and nobody's heard from him since.

         A friend had given one of them our number, someone I thought was a sweet elderly man. We later learned better. Several of these dinners were held at different restaurants. We kept being invited until we invested and even afterwards to convince others.

         Gary called me Ms. Pam, and I thought he was a

charming country boy.

What they were selling is units in a 742-acre gas-and-oil lease in the rich Permian basin in west Texas. The asset was real. I flew down there in a small luxurious plane that I thought belonged to Gary. It didn't.

On the trip were two nice people; the man who invited me to the seminar, Gary, and a young man who wasn't introduced, didn't speak, looked mean, and who I saw again at another seminar standing outside of the room where the meeting was held.

Gary was asking $28,000 per unit. I finally wrote him a check for $84,000 for three units. Sixteen other people bought varied amounts totaling $868,000. He paid $425,000 for the lease and embezzled the rest.

Our understanding was that he would use the money to repair the existing old wells on the lease and/or start drilling new ones. The minimum total of wells that the lease would hold was 70, and that was conservative.

The income potential for the lease was astronomical, and I couldn't think of a wiser way to use my inheritance than to put it somewhere it would grow and be available for my children and grandchildren.

My husband, Dave, was opposed to it, but since it was my money he went along with it. He ended up devoting eight-plus years of his life and $300,000 of our savings to

1  the project, working into the night most of the time to
2  salvage it all for us and the rest of the group.  I feel
3  especially regretful and guilty, not to mention foolish.
4        He felt particularly bad for a Marine Corps friend
5  and his wife who didn't have the cash to put in but had some
6  good diamonds.  Gary gave them two and-a-half units for the
7  diamonds, saying the diamonds would sell for $65,000.  Our
8  friends later learned from the diamond stores that they were
9  worth much more than that.
10        Some of our group received little checks from Gary in
11  the very beginning, and some of them bounced.
12        At the end of the first month our geoscientist on our
13  lease, Ronda, had bills to pay and couldn't find Gary.  We
14  learned he was holed up somewhere with cocaine, needed money
15  for it, and would sell us the lease for $210,000.
16        Ronda, the geoscientist, the man who invited me to
17  the seminar, and his son met Gary at the Nashville airport
18  for two hours and got the lease from Gary for $50,000.  The
19  son paid for it.
20        Little did we know at the time that young Ned, the
21  son, would later devote his life to wreaking havoc on ours.
22  Gary assigned the lease to Phoenix Oil and Gas, LLC, which
23  was the original 18 investors.
24        A month after we obtained the lease, each investor
25  had to put in another $8,000 per unit to keep the lease

Case: 5:09-cr-00181-KKC Doc #: 501 Filed: 05/03/12 Page: 11 of 19 - Page ID#: 7907
U. S. v. Milby, 5:09-CR-181-S
Sentencing Hearing (5/3/12)

11

going. That meant another $24,000 for Dave and me. From that point on, nobody else put money in except the geoscientist and land man, Harry, Ronda, and Dave and me. At the next point of desperation, David and I put in $20,000. We were constantly looking for honest people with capital. It never happened.

During this time, we became more stressed than we ever imagined being. It was a permanent state for us. Sleeping pills were necessary every night. Dave lived at the computer, never knowing what major problem would crop up next and how much it would cost.

We couldn't believe what had become of our lives. We hardly ever talked about anything else. Every time our granddaughters wanted us in Dallas for birthdays, recitals, or just a visit, I went alone. Dave has missed a lot of their little girl years. The little one asked me about a year ago if she'd every see Daddy Dave again.

To add insult to injury, the landowner -- not the leaseholder but the landowner -- was a major thorn in our sides. He did an abundance of dirty deeds to sabotage the lease and cost us money to get the lease back. He did finally succeed. The lease is now his.

Some of his shenanigans were witnessed by oil field workers, but they wouldn't come forward for fear of being deported or worse.

Case: 5:09-cr-00181-KKC Doc #: 501 Filed: 05/03/12 Page: 12 of 19 - Page ID#: 7908
U. S. v. Milby, 5:09-CR-181-S
Sentencing Hearing (5/3/12)

12

1	In 2008, Ronda received a phone call, our
2	geoscientist on the lease, from a man in New Orleans who said
3	he wanted to buy our company, had drilling equipment ready to
4	roll onto the lease, and even had a tough guy to park out on
5	the land to deal with the landowner.
6	Ronda said we were working with other people to get
7	the lease going. He kept calling. And when the other deal
8	fell through, out of desperation, we took a chance on him.
9	Everything out of his mouth was a lie. He never put
10	a dime into the lease. He brought in other crooks, and we
11	finally realized they had a pump-and-dump scheme. They are
12	far more sophisticated than Milby. We have reason to believe
13	they have connections to a pretty bad mob of New Orleans
14	people, and for a while we even wondered if Dave's life was
15	in danger.
16	We learned that Ron, that other -- the second con
17	artist, was a felon and had spent 37 months in prison. That
18	did not show up when we did our due diligence.
19	Long story short, we sued, went to court. Countless
20	hour, all the legal fees paid by us. We witnessed a lot of
21	corruptions in the New Orleans justice system and have been
22	awaiting a judgment for seven months.
23	Ronda and Harry are out $460,000 from putting money
24	into the lease when times were desperate so that we wouldn't
25	lose it, and creditors are knocking at their door for an

1 additional $175,000 worth of bills from the lease that they
2 can't pay.
3 　　　　They have been so stressed that it's affected their
4 health.  The day we -- she was supposed to testify in court
5 in New Orleans she went to the hospital with serious health
6 problems.  She did survive and is all right, and she
7 testified at a later date.  The doctor said it was definitely
8 related to all this that's gone on in their lives.
9 　　　　In June of 2009, the son of the man who brought us
10 Milby accused Dave of colluding with Ron, the New Orleans con
11 artist, while we were suing Ron.  Well, $40,000, three years,
12 and much stress later, he realized he didn't have a leg to
13 stand on and he dropped the lawsuit.
14 　　　　His attorney, who had been censured by the Tennessee
15 Supreme Court, quit sending us threatening letters and quit
16 bringing more chaos to our lives.
17 　　　　About the time he gave up, Dave was subpoenaed by the
18 Tennessee Department of Commerce and Insurance -- by the
19 Tennessee Department of Commerce and Insurance Securities
20 Division because of a complaint filed against Dave by the
21 same man in 2009.  Dave spent two weeks putting together
22 reams of paper and $1,200 on copy fees to take a packet that
23 was about that thick to them to prove his innocence.
24 　　　　We have wondered if the man in our group who sued us
25 did so -- if one of the reasons was so that since we were

1  being sued we couldn't testify in the Milby case and expose
2  his father for his role.
3         My husband, Dave, is pretty much a saint.  He has
4  never once complained for his suffering.  He simply has done
5  what he thought needed to be done, did right by others and by
6  us.  In the Marine Corps, his nickname was "Clean Hallin the
7  Marine."  He was clean not only in appearance but because of
8  his character.
9         Dave's also been inducted into the Hall of Fame in
10 our hometown and has been a leader with a spotless reputation
11 at the Marine Corps, at work, and at every other phase of his
12 life.
13        I think the hardest part of this was being accused of
14 fraud by someone for whom he had worked and tried to help for
15 eight years.  Having his integrity questioned and known by
16 government agencies was really, really tough for him.
17        None of this would have happened if we hadn't handed
18 money to Gary Milby.  Your Honor, we hope that Gary will
19 spend a substantial period of his life in prison, because he
20 has certainly taken a big chunk out of ours.
21        Thank you.
22        THE COURT:  Thank you.
23        Yes, sir.  Please come forward and state your name
24 and spell it for our court reporter.
25        MR. HALLIN:  Yes, your Honor.  My name is David A. --

that's Anthony -- Hallin, H-A-L-L-I-N.

    THE COURT: Thank you, sir. You may proceed.

    SPEAKER: I might have to tear up after my wife's words about me.

    "Nobody ever lost money on an oil deal with me." That was a common phrase used by Gary Milby, and I heard it myself. I didn't attend any of these seminars that my wife was referring to, but we met privately with Gary and Don Treadway and Ned Turner, Jr., on August 3, 2004.

    And I told my wife I didn't want to do this, and the reason is I didn't know anything about oil and gas. But the three of them convinced her that this would be a good investment.

    It was called the Crockett Owens No. 1. It's listed in the indictment. As well as she referred to the lawsuits; I would have appeared in this court had it not been for those, according to the U.S. Attorney here.

    We did not engage in civil litigation with Mr. Milby at the time because we got the lease from him. And also on the advice of counsel that, "You know," he said, "you know, son, you could spend hundreds of thousands of dollars on a civil lawsuit and it will take years, and you may not get anything in return."

    And that, frankly, if I may take an aside, is how a lot of people who engage in scam artists get away with it,

because the victims are not willing to put forth the money and the effort and the time to do it and they may not get anything in return.

Yeah, we have -- as my wife has described, our struggle has been fairly mighty all this time. We had a group of originally 18, and we have been a pretty cohesive group, actually. We've all contributed when necessary on a pro-rata basis to try to preserve and save what we had, what we did get away, but we just didn't have the capital to develop the oil-and-gas lease that we acquired from Mr. Milby.

Excuse me.

And I have been in contact with virtually all of those people ever since. Back in I guess it was 2005 I got a call from a guy named Lee Hughes, who also had a lot of information about other investments. He got my name from a list somewhere.

And I began networking with people who had invested with Mr. Milby subsequently, and I was really just on an e-mail list and I started reading what things that we were involved in and concerned about. And their concerns were very much the same as ours, or ours had been, although they never got a lease in the -- they never got an oil-and-gas lease, as we had acquired.

In any case, Lee was sort of the impetus for creating

1  a network of investors known to have invested with Mr. Milby.
2  It wasn't 600 -- as I understood yesterday, there were 600
3  victims, but it was only -- it was only a few.
4       But the only thing I contributed to their effort was
5  is I got them in contact with an attorney named Wynne James,
6  who won -- who subsequently represented about 75 of them and
7  got a $5 million-plus judgment against Mr. Milby.  I don't
8  know what year that was, it's probably 2008 or '09.
9       One of our partners is a fellow named Gary Dunham,
10 who had invested a lot of money in this project and one
11 earlier, apparently.  He's been one of our partners.  And
12 he's still working now, unable to retire because he lost a
13 substantial amount, apparently.
14      I also spoke with a fellow named Randy Elkins who
15 tried to represent his father-in-law.  About all I can recall
16 from those conversations was that he was a retired dentist
17 and had cancer and wanted to make some kind of investment
18 with funds that he had so that his wife would have some kind
19 of income after he was no longer here.
20      And I'm sure the Court has heard a lot of other
21 stories about this as the case progressed.
22      Your Honor, the message that I really want to relate
23 to you, and I've done that in a statement earlier which I
24 submitted last year, is that for victims of this kind of
25 fraud civil litigation is expensive, it's -- it is lengthy,

1  and it may ultimately have no positive result.  So when you
2  get someone who had done these things to these people and
3  that many people, you need to take -- impose the maximum
4  penalty available.
5       I don't know if that would deter him; in fact, if he
6  got out any time soon, he would probably do the same thing.
7       Thank you, your Honor.
8       THE COURT:  Thank you very much.
9       Is there any other victim who wishes to bring
10 testimony or a statement before the Court?
11      MR. TAYLOR:  I'm not aware of any, your Honor, that
12 are here today.
13      THE COURT:  Very well.  Mr. and Mrs. Hallin, thank
14 you very much for being here, and thank you for your patience
15 with the Court and this proceeding today.  As you can tell,
16 we didn't really know how we were going to be able to
17 proceed.
18      I will make sure that your statements are
19 transcribed, given to Mr. Milby and to Mr. Murphy.
20      Counsel, I think that we really just don't have
21 enough information at this time to go ahead and schedule the
22 sentencing hearing.  I will not be in town next week Tuesday
23 through Friday, and I understand that we have matters
24 scheduled Monday afternoon.  So it will probably have to be
25 the week after next before we can again convene, unless we

1  could do so possibly Friday afternoon.

2       So when you all get some information, if you will

3  call my office and we'll try to -- we'll try to reschedule

4  the sentencing hearing at a time that's mutually convenient.

5       Thank you all for your patience, and that concludes

6  this Court's business for the afternoon.

7       (Proceedings concluded at 1:32 p.m.)

8       I certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled matter.

9

10      *Rhonda S Sansom*                         5/3/2012
        _____     _____
11       Rhonda S. Sansom, RPR, CRR                  Date

12             ORIGINAL TRANSCRIPT FILED ELECTRONICALLY