**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name:   14a0537n.06**

**Case Nos. 12-5574/5611/6090**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

```
UNITED STATES OF AMERICA,          )
                                   )
      Plaintiff-Appellee,          )
                                   )          ON APPEAL FROM THE
      v.                           )          UNITED STATES DISTRICT
                                   )          COURT FOR THE EASTERN
BRYAN COFFMAN and GARY MILBY,      )          DISTRICT OF KENTUCKY
                                   )
      Defendants-Appellants.       )
                                   )
_____    )
                                   )
```

**FILED**
Jul 22, 2014
DEBORAH S. HUNT, Clerk

**BEFORE: BATCHELDER, Chief Judge; GUY and MOORE, Circuit Judges.**

   **ALICE M. BATCHELDER, Chief Judge.**   After a fifteen-day trial in the Eastern District of Kentucky, a jury convicted Bryan Coffman, a Kentucky lawyer, and Gary Milby, a co-defendant who proudly describes himself as an oil man, of various counts of fraud and money laundering.   In a scheme involving shell companies and securities in Kentucky oil wells, Coffman and Milby had defrauded almost 600 investors out of over 36 million dollars during a five-year period.   The district court sentenced Coffman to 300 months in prison and Milby to 240 months in prison.   Coffman appeals various aspects of his conviction and sentence.   Milby appeals his conviction.[1]   For the reasons that follow, we **AFFIRM**.

_____

[1]We refer to Coffman and Milby collectively as "defendants."

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

**I.**

Before we describe the facts of the case, a little background information about securities in the oil and gas industry is helpful.   There are legitimate securities investment plans called oil or gas well-drilling programs.   A general partner establishes and manages each program, identifies a suitable drilling location, obtains a lease to the mineral rights for that location, and estimates the cost of drilling and production.   The general partner then describes the program in a "Private Placement Memorandum" (PPM), which informs investors of the potential risks and profits of the investment.   Investors purchase shares in the program, and, if the program is successful, the oil or gas is sold to local distributors.   Investors receive profits via royalty checks.

This tale of the oil man and his lawyer began in 2002.   In that year, Coffman prepared documents to form a Kentucky oil-drilling company, Mid-America Oil & Gas, for his client, Milby.   In 2003, Milby filed for bankruptcy, employing Coffman as his attorney.   Later, in 2004, Coffman prepared for Milby documents to form Mid-America Energy, Inc., a Nevada corporation. Mid-America Energy, Inc., (Mid-America) was a management company that provided funds for the drilling operations of Mid-America Oil & Gas.

Over the next several years, Milby enticed potential Mid-America investors with false promises of large investment returns, often taking them to see oil wells he operated in Adair and Green Counties, Kentucky.   Milby, however, knew that because a fractured oil reservoir with spotty oil deposits lies beneath Adair and Green Counties, wells in these counties would never produce the large amounts of oil he promised to Mid-America investors.

After Milby received checks from investors, his office wired the money to Coffman, who managed company funds.   Coffman aided Milby in misleading investors to believe that wells

2

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

drilled in Adair and Green Counties would produce extraordinary amounts of oil.   Coffman had received a complaint from investors in Texas in 2004 alleging that Milby and Mid-America companies were misusing oil well investor funds and committing fraud.   One investor had even said he trusted Coffman because he was a lawyer.   But when potential investors contacted Coffman seeking information about Milby, Coffman–knowing that Milby was perpetrating a fraud–vouched for investments in Mid-America and the legitimacy of the operation.

Coffman also directly misled investors.   He created Mid-America investor programs and filled out for prospective investors PPMs that included false and misleading information. Investors relied on those PPMs in making investment decisions.

Coffman and Milby utilized forty-two bank accounts in perpetrating the fraud.   In 2005 and 2006, Mid-America received $19.3 million from investors but had only $893,000 in revenue from oil sales.   Milby and Coffman distributed only a few hundred thousand dollars to Mid-America investors during that period, but used millions of dollars of the investors' money for personal expenses.   Coffman knew that the Mid-America investors were receiving only small checks; he had prepared the investors' tax forms showing the amounts of their losses.

By 2006, investors realized that something was rotten in Mid-America, and one of them lodged a complaint with the Securities and Exchange Commission, which began investigating Milby and Mid-America.   Several states launched investigations as well, issuing subpoenas and summonses and filing cease-and-desist orders and contempt orders against Milby and Mid-America based upon state securities fraud and other violations.   Milby and Coffman received notices of these actions.

In 2006, Coffman suggested starting an off-shore oil investment company because of the legal trouble Mid-America was experiencing in the United States.   He and Milby founded Global Energy Group with a Mid-America investor named Victor Tsatskin, a Canadian who had invested in Mid-America oil wells and realized that his investment was worthless.   The three men agreed that Coffman would structure Global like Mid-America and that some of the investment sales would occur in Canada.   Coffman planned to pocket a large portion of investors' funds and to mislead investors into believing that an independent escrow agent would be holding those funds. Coffman knew that Milby had no intention of drilling wells for Global investors.

All three men traveled to Toronto, Canada, in 2007 to train several Global salespersons. At those sessions, at which Coffman was present, Milby made false claims about oil production, intending that salespersons would repeat those claims to investors.   Coffman later prepared the Global PPM for distribution to Global investors.

Throughout 2007 and 2008, Canadian investors provided funds to Global after Global salespersons promoted the investment.   Global had little revenue from oil sales, but took in over $16 million of investors' money.   Coffman took about half of it.   Not surprisingly, when returns on their investments were meager, investors became suspicious.   One group of investors initiated an investigation through a state agency in 2008.   When Coffman was deposed in the course of the investigation, he was evasive and misleading.

Coffman engaged in multiple complicated financial transactions with Global investors' money that made tracing the flow of funds difficult.   He moved investors' money through several bank accounts into an investment account that he held with his wife, Megan Coffman, and he later transferred his interest in the investment account to Megan.   He funneled investors' funds through

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

various bank accounts, including the account of one of Megan's companies, and into an attorney account in order to purchase a South Carolina condominium where his sister-in-law lived and where he later moved Global's office.  Coffman signed documents for the purchase of a $1.5 million yacht and, to make the down payment on it, transferred investors' money through a bank account of a company owned by Megan and through an attorney's escrow account.  The yacht became the property of another of Megan's companies.

On October 8, 2008, federal agents executed search warrants at Coffman's Lexington law office and at the South Carolina condominium, seizing documents and computer hard drive data.  On December 4, 2009, a grand jury returned an indictment charging Milby, Tsatskin, Coffman, and Coffman's wife Megan, with various fraud and money laundering counts.

After a fifteen-day trial in the spring of 2011, a jury convicted both Milby and Coffman of mail fraud, wire fraud, and securities fraud.  The jury also convicted Coffman of conspiracy to commit money laundering and money laundering.   Megan Coffman was acquitted of all charges. Upon the Government's motion, the court dismissed all charges against the fourth defendant, Victor Tsatskin, after he pleaded guilty in Canada to a securities fraud charge based upon the same fraud scheme, testified against Coffman and Milby, and later received in Canada an imprisonment sentence of three years.   Neither Coffman nor Milby testified at trial.

Coffman's advisory sentencing guidelines range for imprisonment was 324 to 405 months, and Milby's was 262 to 327 months.   The court sentenced each defendant below his guidelines

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

range, sentencing Coffman to 300 months and Milby to 240 months in prison.   Coffman timely appealed his conviction and sentence.   Milby timely appealed his conviction.[2]

## II.

### A.   Sufficiency of the Evidence

Coffman first argues that the evidence was not sufficient to convict him of mail, wire, and securities fraud, or conspiracy to money launder and money laundering.   "For sufficiency of the evidence challenges, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   *United States v. Sease*, 659 F.3d 519, 523 (6th Cir. 2011) (internal quotation marks omitted).   We examine the evidence supporting the conviction for each crime in turn.

### 1.   Mail, Wire, and Securities Fraud

To sustain a conviction for mail fraud under 18 U.S.C. § 1341, the Government must prove "(1) a scheme or artifice to defraud; (2) use of mails in furtherance of the scheme; and (3) intent to deprive a victim of money or property."   *United States v. Warshak*, 631 F.3d 266, 310 (6th Cir. 2010) (quoting *United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006)).   The elements of wire fraud under 18 U.S.C. § 1343 are identical to the elements of mail fraud except that wire fraud's second element requires use of "an interstate wire communication in furtherance of the scheme." *United States v. Cunningham*, 679 F.3d 355, 370 (6th Cir. 2012) (quoting *United States v.*

---

[2]We grant defendants' motions to adopt each other's arguments pursuant to Fed. R. App. P. 28(i).   That rule states: "In a case involving more than one appellant . . . any number of appellants . . . may join in a brief, and any party may adopt by reference a part of another's brief.   Parties may also join in reply briefs."   *Id.*

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

*Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010)).   The offense of securities fraud under 15 U.S.C. § 78j(b) is "quite similar" to mail fraud "in that it also calls for proof of a scheme or design to defraud incident to the purchase or sale of a security" and "the use of an instrumentality of interstate commerce or of the mails in furtherance of that scheme or design."   *United States v. MacKay*, 491 F.2d 616, 619 (10th Cir. 1973).   "Both statutes require a specific intent to defraud."   *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998).

Coffman argues that there was not sufficient evidence to prove the intent element for each of the crimes.   To have intent, "a defendant must knowingly make a material misrepresentation or knowingly omit a material fact," and "the misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission."   *DeSantis*, 134 F.3d at 764.   "[A] jury may consider circumstantial evidence of fraudulent intent and draw reasonable inferences therefrom.   Intent can be inferred from efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits."   *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (internal quotation marks and citations omitted).

We are not persuaded.   The Government presented evidence that Coffman created Mid-America and Global investor programs at Milby's direction.   Witnesses testified that Coffman prepared prospectuses used to mislead investors about potential profits, and that Coffman knowingly failed to inform inquiring investors that Milby had gone bankrupt and that Milby's companies were under investigation for fraud.   Testimony also indicated that Coffman set up Global as an off-shore company to defraud investors after the SEC and several states began investigating Mid-America.

7

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

The evidence presented at trial demonstrated that Coffman received millions of dollars from Mid-America and Global, all the while aware that investors were receiving minimal returns from oil production.   Coffman funneled these millions of investors' dollars through multiple bank accounts.   Any rational trier of fact could have found this evidence sufficient to demonstrate intent.

Coffman seeks to analogize this case to *Bennett v. Durham*, 683 F.3d 734 (6th Cir. 2012). In *Bennett*, we held that a Kentucky securities law did not impose civil liability on "an attorney who performs traditional legal services for a company offering its securities for sale to the public." *Id.* at 735.   The key difference between this case and *Bennett*–other than *Bennett*'s being a civil case–is that here the Government presented strong evidence that the lawyer–Coffman–actively participated in the fraud scheme.

### 2.  Conspiracy To Money Launder

Coffman contends that there was insufficient evidence to convict him of conspiracy to money launder because the jury acquitted his wife, Megan, who was the only other co-conspirator. Coffman invokes the rule of consistency, which says that if coconspirators are tried together, an acquittal on conspiracy charges as to all but one coconspirator mandates acquittal on conspiracy charges as to the remaining defendant.   *See United States v. Williams*, 503 F.2d 50, 54 (6th Cir. 1974).   But this court has stated that the rule of consistency "is no longer good law."   *Id.   See Getsy v. Mitchell*, 495 F.3d 295, 307 (6th Cir. 2007) (en banc) (citing *United States v. Crayton*, 357 F.3d 560, 565-66 (6th Cir. 2004)).   The jury's acquittal of the only other co-conspirator allegedly involved in the conspiracy does not preclude their finding Coffman guilty of conspiracy to money launder.   His argument on this issue fails.

8

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

### 3.   Money Laundering

The jury also convicted Coffman of ten counts of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i).   Money laundering requires proof of: "(1) use of funds that are proceeds of unlawful activity; (2) knowledge that the funds are proceeds of unlawful activity; and (3) conduct[ing] or attempt[ing] to conduct a financial transaction, knowing that the transaction is designed in whole or in part to disguise the nature, location, source, ownership or control of the proceeds."  *United States v. Prince*, 214 F.3d 740, 747 (6th Cir. 2000) (quoting *United States v. Moss*, 9 F.3d 543, 551 (6th Cir. 1993)).

Coffman maintains that his simply transferring money from his bank account to his wife's bank account is not enough to prove that he had a purpose to conceal.  This argument fails because, "[w]hen a sequence of transactions is sufficiently complex, a reasonable juror may infer that the transactions were made for the purpose of concealment."  *Warshak*, 631 F.3d at 321 (internal quotation marks omitted).  The Government provided bank records and diagrams demonstrating how Coffman moved investor funds among numerous bank accounts.  These transactions included the transactions between him and his wife.

Coffman also argues that because his wife, Megan, controlled the funds involved in several of the transfers, Coffman did not have the requisite intent to conceal.   But a reasonable juror could have concluded that the transactions were not totally within the control of Megan.   The Government provided evidence at trial that Coffman signed documents involved in the transfers, and Government trial exhibits detailing the large number and types of transfers also evidence Coffman's control of the transactions.   A reasonable juror could have concluded from this evidence and Coffman's involvement with Mid-America that Coffman performed these transfers

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

in order to conceal funds.

## B.   Admission and Exclusion of Evidence

Defendants assert that the district court erred in excluding several pieces of evidence and in admitting other evidence.   We review "the district court's decision to admit evidence for an abuse of discretion."   *United States v. Blanchard*, 618 F.3d 562, 569 (6th Cir. 2010).   A district court abuses its discretion by making "errors of law or clear errors of factual determination in evidentiary rulings."   *United States v. Geisen*, 612 F.3d 471, 495 (6th Cir. 2010) (internal quotation marks and citations omitted).

First, Coffman maintains that the district court abused its discretion when it refused to let him cross examine Tstatskin about the range of punishment he was facing in the United States. Such information, Coffman contends, would have shown Tsatskin's motivation for testifying against him.   We find no merit in this claim because this question was neither probative of Tsatskin's bias or motive for testifying nor useful for impeachment.   At the time he made the plea deal, Tsatskin did not know the length of any prison term he faced if he were convicted in the United States; he learned only after he had agreed to the deal what his punishment would likely be.

Even if Coffman's question to Tsatskin were probative of bias or motive, the district court did not abuse its discretion in excluding the testimony because "the jury was otherwise in possession of sufficient information . . . to make a discriminating appraisal of [the] witness' motives and bias."   *United States v. Kone*, 307 F.3d 430, 436 (6th Cir. 2002) (internal quotation marks, citations, and brackets omitted); *see also United States v. Lanham*, 617 F.3d 873, 884 (6th Cir. 2010).   The jury heard testimony that Tsatskin made a deal with the United States government in which he agreed to come to Kentucky to testify and the United States agreed to

10

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

have the indictment against him dismissed.   This information was sufficient to show Tsatskin's motive and bias in testifying against Coffman.

Milby argues that the district court erred when it refused to allow him to cross-examine Tsatskin about an arguably inconsistent statement Tsatskin made during trial, as well as about two unrelated forgery charges.   But the jury heard both the testimony that Tsatskin received multiple cease-trade orders based on securities violations and Tsatskin's admission that the Canadian government prohibited him from selling cars because he did not have a license to do so.   This was ample evidence to permit the jury to make a sound appraisal of Tsatskin's character.

Milby next maintains that the district court erred when it refused to admit into evidence statements attached to a report detailing an investigation into Global by the Ontario Securities Commission and to allow defendants to cross-examine Tsatskin about the statements.   But witness statements in a report are hearsay and are not admissible under Rule 803(8) of the Federal Rules of Evidence.   *See Tranter v. Orick*, 460 F. App'x 513, 515 (6th Cir. 2012) (per curiam). We find no abuse of discretion here.

Coffman contends that the district court erred in admitting a recording of a civil deposition Coffman gave before a Kentucky state investigator because, at the time of the deposition, Coffman was unaware of any pending criminal investigation against him.   Coffman did not raise the issue at trial; moreover, he consented to the introduction of the recording.   He has therefore waived this argument, *see United States v. Street*, 614 F.3d 228, 234 (6th Cir. 2010), and must demonstrate plain error, that is, an error that "was obvious or clear."   *United States v. Doyle*, 711 F.3d 729, 732 (6th Cir. 2013).   Coffman makes no such showing.   To prove impermissible commingling of civil and criminal investigations, he must demonstrate "trickery or cloaking of the criminal

11

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

investigation as civil." *United States v. Setser*, 568 F.3d 482, 493 (5th Cir. 2009) (internal quotation marks omitted). Coffman provided no evidence whatever to support such a claim.

Both defendants argue that the district court erred when it admitted investors' testimony concerning statements by Global and Mid-America salespeople about investments, including testimony that a Global salesperson made misrepresentations to them about oil production amounts and expected returns on their investments. Coffman first maintains that this testimony violated the parol evidence rule. Coffman, however, waived this argument because he did not raise it in the district court. *See, e.g.*, *United States v. Murphy*, 241 F.3d 447, 450–51 (6th Cir. 2001). At trial, Coffman's objections to the testimony related solely to hearsay and the right to confrontation. We therefore review this objection for plain error, *see Doyle*, 711 F.3d at 732, and we find none. "Parol evidence is admissible to show that the making of a contract was procured by fraudulent representations." *Waldman v. Stone*, 698 F.3d 910, 923 (6th Cir. 2012) (citing *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 260 (Ky. App. 2007)).

Coffman and Milby also argue, however, that the district court erred by admitting this testimony because the statements are hearsay. "Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted." *United States v. Hathaway*, 798 F.2d 902, 904 (6th Cir. 1986) (quoting *Anderson v. United States*, 417 U.S. 211, 219 (1974)). These false statements were offered not to prove the truth of the expected returns or profitability of the oil wells, but to prove that the salespersons' oral promises were false and misleading. Because these statements are not hearsay, the district court did not abuse its discretion in admitting them. *See Hathaway*, 798 F.3d at 905.

12

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

Both defendants contend that the district court abused its discretion when it allowed Manning Warren, a securities law professor, to testify as an expert witness concerning the duties of a securities lawyer.   Properly qualified expert testimony is admissible if it "will help the trier of fact to understand the evidence or to determine a fact in issue."   Fed. R. Evid. 702(a).

Defendants maintain first that Warren's testimony about a securities lawyer's role was incorrect and not reliable.   Warren testified that:

> A securities lawyer is there to independently investigate.  He's not entitled to believe what his client said.  That's when -- I mean, you usually find yourself adverse to your client; sometimes it's not particularly pleasant, because you are supposed to be a skeptic, a devil's advocate with your client.   And you want to hear what your client has to say, but then you want to go out there and independently verify it.

Because defendants did not object to this testimony at trial, we review only for plain error.  *See United States v. Ham*, 628 F.3d 801, 804 (6th Cir. 2011).   While defendants dispute the accuracy of Warren's testimony, the district court did not plainly err in admitting it.   Defendants' arguments "go to the weight the jury should afford the evidence, not to its admissibility."  *United States v. Crosgrove*, 637 F.3d 646, 658 (6th Cir. 2011).   Defendants were "able to raise each of [their] points at trial, both through cross examination and closing arguments."  *Id.*   In fact, Coffman's counsel vigorously questioned Warren on his views.   Admitting expert testimony that is debatable is not plain error.

Defendants also argue that the district court erred when it admitted Warren's testimony about what constitutes "materiality" for purposes of securities law.   Warren testified that part of the duty of the securities lawyer is to insure his clients' compliance with the securities law's prohibition against making "any material misrepresentations of fact."   The prosecutor asked

13

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

Warren to provide the "standard definition" for "what is material."  Warren explained that information is "material" if there is a "substantial likelihood that the information is information that an investor would find important in making his or her investment decision."   The prosecutor then asked Warren to explain categories of material disclosures based on the usual and customary practice of a securities lawyer.   In response to defense counsel's objection, the district court instructed the jury that the court would instruct them as to the meaning of the law, and that they were to limit their consideration of Warren's testimony to "determining what is ordinarily and customarily done by securities lawyers in their practices."

Defendants assert that an expert cannot testify on legal questions at all, citing *United States v. Zipkin*, 729 F.2d 384 (6th Cir. 1999).   In *Zipkin* the court held inadmissible expert testimony about the meaning of the specific provision of law the defendant was accused of violating.   *Id.* at 387.   Here, however, Warren was testifying about the lawyer's duty to protect his client from civil liability in the securities context.   He was not testifying about the legal standard the jury was to employ in deciding the instant case.   The court made this clear in its limiting instruction.   Moreover, in its final instructions to the jury, the court defined "material" in terms nearly identical to those used by Warren.

Defendants also assert that the district court erred because it permitted Warren to testify regarding the ultimate issue of defendant's guilt.   They point to Warren's responses to hypothetical questions posed by the prosecutor regarding misrepresentations in PPMs and warnings of risk contained in documents such as subscription agreements, and to his statement that Coffman was subject to criminal liability.   But hypothetical questions to an expert witness are permissible, *see*

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

*United States v. Collins*, 78 F.3d 1021, 1037 (6th Cir. 1996), and as this court explained in *Collins*, hypothetical questions to an expert do not withdraw the issue of guilt from the jury. *Id.* Warren's opinion regarding Coffman's criminal liability was merely part of his explanation of a hypothetical dealing with a different criminal charge related to securities law. It was not an opinion on the ultimate question of guilt at issue in the case.

Defendants argue that the district court erred when it admitted testimony from John Cullen, a Kentucky state investigator, which, defendants complain, amounted to legal conclusions. During the cross-examination of Cullen, Coffman sought to establish that Cullen's office did not have authority to investigate Global because Global had no Kentucky investors. On redirect, in order to establish that Cullen's office did have jurisdiction to investigate Global, the Government asked Cullen whether a Global representative's taking an investor to a well site in Kentucky to induce him to invest in the program would constitute an offer of securities in Kentucky. The district court ruled the Government's question was merely an effort to refute Coffman's suggestion that Cullen's office lacked jurisdiction to investigate Global, and that Coffman's attorney had "opened the door for the government's line of inquiry." *United States v. Ramos*, 861 F.2d 461, 468-69 (6th Cir. 1988). We find no abuse of discretion here.

Defendants next argue that four witnesses provided lay opinion testimony in violation of Federal Rule of Evidence 701, which states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

15

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

A foundational requirement of Rule 701 is that the witness have "personal knowledge of the outward events" that supports assertions made in testimony.   *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985).

Coffman has failed to develop his argument that Government witnesses gave improper lay opinion testimony, simply claiming in summary fashion, with no explanation whatsoever, that four statements contained lay opinions.   Thus, Coffman has waived the issue.   *See, e.g.*, *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) ("We require parties to develop their arguments in a non-perfunctory manner at the risk of having them deemed waived.").

But even if Coffman has not waived the issue, his argument has no merit.   The first witness Coffman mentions, Shiping Chen, invested in Mid-America after hearing Milby's sales pitch, and after Coffman assured him that Milby was successful and that Chen's money would be secure. Chen testified that after he failed to receive returns on his investment in Mid-America, he decided that Coffman was "the key criminal in this scam."   Because Coffman did not object to this testimony at trial, our review is for plain error.   *See Ham*, 628 F.3d at 804 (6th Cir. 2011).   Chen's testimony is arguably rationally based on his perceptions because it is founded on his interactions with Coffman and Milby.   Furthermore, the entirety of Chen's testimony covers 125 transcript pages.   Even if this one statement, upon which Coffman now focuses, were improper, we have found harmless error where "this error involved only one brief question out of a rather lengthy trial."   *Torres*, 758 F.2d at 150.

The second witness Coffman points to is Eric Taylor, who testified that he suspected that Coffman and Milby were stealing his money after Milby threatened him and Coffman refused to provide information about the money he had invested.   Coffman's attorney attempted to impeach

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

Taylor by showing that Taylor hoped to recover money in a lawsuit if Coffman were convicted. Coffman's attorney asked, "You have been advised, though, that if you convict Bryan Coffman you might get some money?"   Taylor answered, "Well, when Bryan Coffman has our monies in Panama and the Cayman Islands and — [here Coffman's attorney objected] — and the Bahama islands, yes absolutely."   Later, Coffman's attorney tried to establish that Taylor knew that his investment was risky.   The attorney asked, "Now, again, you were advised over and over about the risk in the stock.   Correct?"   Taylor said, "Yes."   The attorney then asked, "And where the money would be going?"   Taylor responded, "To Gary Milby, not to Bryan Coffman and to Panama, yes."   The defendants then moved for a mistrial.   The court denied the motion.

The district court, however, almost immediately instructed the jury to disregard that testimony.   The court's limiting instruction "was immediate, clear, and forceful," and "the remark was only a small part of the evidence against the defendant."   *United States v. Caver*, 470 F.3d 220, 243, 245 (6th Cir. 2006) (internal citations omitted).   Taylor's testimony was not "so clearly improper and prejudicial" that the court's instruction could not have "erased" any harm to the defendants.   *United States v. Howard*, 621 F.3d 433, 459 (6th Cir. 2010).   At the beginning of the next day of the trial, the district court reminded the jury of the instruction to ignore that testimony, and asked the jurors if they could follow the instruction.   Each juror answered affirmatively.

Taylor's statements were a small part of the evidence against Coffman.   In the context of "all that happened" in the trial, there is no "reasonable possibility" "that the evidence complained of might have contributed to the conviction."   *United States v. Bell*, 516 F.3d 432, 447 (6th Cir. 2008).   We conclude that this error was harmless.   *See Torres*, 758 F.2d at 150 (finding harmless

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

error where "this error involved only one brief question out of a rather lengthy trial.")   The district court did not abuse its discretion in dealing with Taylor's testimony.

Coffman's remaining claims of lay opinion testimony are also meritless.   In response to a question from Coffman's attorney, Roberta Bottoms testified that, "Mr. Coffman was the true owner" of Global.   Coffman "cannot complain about the discussion elicited by his own counsel." *United States v. Lay*, 612 F.3d 440, 448 (6th Cir. 2010).   Finally, Coffman claims that the Kentucky investigator John Cullen testified that Coffman was involved in criminal activity.   In fact, Coffman's attorney made that statement in a question in which he quoted Cullen's affidavit. Coffman cannot challenge the admission of evidence he introduced.   *See Ohler v. United States*, 529 U.S. 753, 755 (2000).

Finally, defendants argue that the district court abused its discretion when it prohibited the admission of testimony expressing opinions on the quality and accuracy of the Government's investigation.   Citing only one case, defendants maintain that evidence discrediting an investigation may be relevant and material.   *See Jeffries v. Morgan*, 446 F. App'x 777 (6th Cir. 2011).   In *Jeffries*, we addressed a defendant's claim that the prosecution had failed to disclose exculpatory material.   *Id.* at 778.   But here, defendants make no such claim, and a trial court does not abuse its discretion in excluding as irrelevant accusations that the Government's investigation was not perfect.   *See United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994).   Relying on *Veal*, the district court properly prohibited defendants from making unsupported accusations about the Government's motivation in bringing the case.   The defendants were able to attack the quality of the investigation through cross examination of Government witnesses.   This argument is meritless.

18

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

### C.   Authenticity of Bank Records

Coffman argues that the district court erred when it admitted thousands of pages of bank records documenting Coffman's money transfers because they were not properly authenticated under Federal Rule of Evidence 803(6).   At trial, Government witnesses testified that they used the bank records to create consolidated charts and documents outlining the flow of money into and out of Mid-America and Global bank accounts.   We review "the district court's decision to admit evidence for an abuse of discretion."   *Blanchard*, 618 F.3d at 569.

Business records may be admissible if the records are properly authenticated.   Fed. R. Evid. 803(6).   Coffman argues that the admitted bank records must be authenticated as provided in Federal Rule of Evidence 902(11), which permits authentication of "certified domestic records of regularly conducted activity" without "[e]xtrinsic evidence of authenticity," provided the records are admissible under Federal Rule of Evidence 803(6), and are accompanied by a certificate meeting the rule's standards.   Because the Government did not have a certificate authenticating the bank records, Coffman argues, the court should have excluded them.

Coffman is mistaken.   Official certification is not the only means by which documents may be authenticated; they may also be authenticated using a "custodian or other qualified witness." Fed. R. Evid. 803(6)(D).   Regarding that provision, we have said:   "there is no reason why a proper foundation for application of Rule 803(6) cannot be laid, in part or in whole, by the testimony of a government agent or other person outside the organization whose records are sought to be admitted.   When a witness is used to lay the foundation for admitting records under Rule 803(6), all that is required is that the witness be familiar with the record keeping system." *Hathaway*, 798 F.2d at 906.

19

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

Witnesses, including Assistant United States Attorney Lisa Hasday and Ryan Lee, a United States Postal Service analyst, testified to the authenticity of the records.  Hasday testified that using account numbers from investors' deposited checks, she subpoenaed bank records for a given time period.  This testimony evinces a familiarity with the record keeping system of the banks.  Lee's testimony described the process for obtaining those bank records, demonstrating that he was familiar with the record keeping system of the banks.  And the admitted documents had the appearance of bank records, and some of them contained Coffman's name and signature.  The district court did not abuse its discretion in admitting the bank records.

In *United States v. Sandles*, we reversed a conviction because the government had failed to provide sufficient evidence that a bank's deposits were FDIC-insured.   549 F.3d 508, 516 (6th Cir. 2006).  But in that case the FDIC insurance of the deposits was an element of the offense.  *Id.* Here, the Government simply had to comply with Rule 803(6).   The district court did not abuse its discretion in finding that the Government had done so.

### D.  *Morrison* **and Extraterritoriality**

Defendants urge that the district court's refusal to dismiss counts 1-10, 14-19, and 34, which related to defendants' activities regarding Global, is contrary to the requirements of *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010).   We review de novo the district court's legal conclusions supporting its denial of the defendants' motion to dismiss the indictment.  *See, e.g.*, *United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 2013).

In *Morrison*, the Supreme Court endorsed the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."   130 S. Ct. at 2877 (internal citations omitted).   Because Global

20

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

is a corporation domiciled in the Bahamas, all of Global's sales offices are located in Canada, and Global solicited and sold partnerships only to Canadian foreign investors, defendants argue against extraterritorial application of several statutes. The Government responds that the presumption against extra-territoriality in *Morrison* is applicable only to civil cases, citing *United States v. Bowman*, 260 U.S. 94 (1922).

We do not need to decide the reach of the *Morrison* presumption because defendants' domestic conduct falls within the ambit of each of the statutes. Count 34 alleges a violation of 15 U.S.C. § 78j(b). Counts 5, 6, 8, 9 and 10 allege violations of 18 U.S.C. § 1341. Counts 14-19 allege violations of 18 U.S.C. § 1343. We turn first to § 78j(b).

### 1.  15 U.S.C. § 78j(b)

Section 10(b) of the Securities Exchange Act of 1934 is codified at 15 U.S.C. § 78j(b). That provision states, in part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

The Court in *Morrison* found that section 10(b) applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." 130 S. Ct. at 2884. In interpreting the Securities Act, the Court argued:  "[W]e think that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Id.* In *Morrison*, Australian plaintiffs sued an Australian bank and American

21

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

defendants for losses on stock purchases traded on an Australian exchange and other foreign exchanges. *Id.* at 2875-76. "[A]ll aspects of the purchases . . . occurred outside the United States." *Id.* at 2888.

In the case before us, Global investors wired and mailed money to Coffman in the United States. These transactions thus occurred partially in the United States. Global repeatedly held itself out to investors as being headquartered in Kentucky, instructed investors to mail or wire their investments to Bryan Coffman in Kentucky and later, South Carolina, which the investors did, and encouraged investors to travel to central Kentucky where Global representatives showed them oil wells. Because portions of the transactions involved in this case occurred in the United States, it is fair to characterize them as "domestic." *Morrison*, 130 S. Ct. at 2884. The district court did not err in refusing to dismiss the counts relating to Global.

### 2.   18 U.S.C. §§ 1341, 1343

The district court also properly denied defendants' motion to dismiss counts 5-6, 8-10 and 14-19 charging mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. As the district court explained, the mail and wire fraud counts against Coffman and Milby involved the use of "U.S. mail and interstate wires to execute the alleged scheme to defraud." *United States v. Coffman*, 771 F. Supp. 2d 735, 738 (E.D. Ky. 2011). Mail fraud occurs in "the place of mailing or delivery by mail." *United States v. Wood*, 364 F.3d 704, 711 (6th Cir. 2004) (quoting *Kreuter v. United States*, 218 F.2d 532, 534 (5th Cir. 1955)). Similarly, as the district court held, wire fraud occurs in the United States when defendants use interstate wires as part of their scheme. *Coffman*, 771 F. Supp. 2d at 738 (citing *Pasquantino v. United States*, 544 U.S. 349, 371 (2005)). The

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

### E.   Severing the Trial

Before trial, Coffman moved to sever his trial from Milby's pursuant to Federal Rule of Criminal Procedure 14.   Rule 14 permits the court to grant a severance if "consolidation for trial appears to prejudice a defendant."   Fed. R. Crim. P. 14.   The district court denied his motion.   We review a district court's denial of a severance motion "for a clear abuse of discretion."   *Caver*, 470 F.3d at 237.

Although Coffman moved for severance before trial, he failed to renew his motion at the close of the evidence.   Therefore, he has waived the claim that he was entitled to severance.   *See United States v. Sturman*, 951 F.2d 1466, 1476 (6th Cir. 1991).   Coffman argues that his wife, Megan, renewed her motion for severance at the close of the evidence, and that this renewal was joined by the other co-defendants because of the district court's standing order that all defendants were presumed to join in the motions of the other defendants.   This argument fails because a motion for severance is particular to the individual making the motion and cannot be joined by other defendants.

Even if Coffman did not waive the issue, the district court did not abuse its discretion in refusing to sever the trials of the defendants.   The Supreme Court has stated that, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."   *Zafiro v. United States*, 506 U.S. 534, 539 (1993).   Even where the risk of prejudice is high, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice."   *Id.* at 534.   For Coffman to prevail on his severance

23

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

argument, he must show "compelling, specific, and actual prejudice from [the] court's refusal to grant the motion to sever." *United States v. Ross*, 703 F.3d 856, 885 (6th Cir. 2012). The district court provided limiting instructions designed to mitigate any potential for prejudice, and Coffman fails to point to any specific or actual prejudice resulting from the joint trial, let alone any compelling prejudice. Coffman's claim of error is meritless.

### F.   Aiding and Abetting Instruction

Coffman asserts that the district court erred when it permitted the Government to amend the indictment at the conclusion of its case. We review de novo whether there was an amendment or a variance to the indictment. *See United States v. Flowal*, 163 F.3d 956, 962 (6th Cir. 1998). The Government never attempted to amend the indictment, only requesting an instruction on aiding and abetting under our decision in *United States v. McGee*, 529 F.3d 691 (6th Cir. 2008). Consistent with *McGee*, the district court gave the instruction and did not commit error in doing so. A district court may give an instruction on aiding and abetting as an alternative theory of liability even if the indictment does not refer to this theory because "aiding and abetting is embedded in federal indictments." *Id.* at 695-96.

### G.   Eric Taylor's Testimony

Defendants argue that they were entitled to a mistrial based upon Eric Taylor's prejudicial testimony. We review for abuse of discretion a district court's denial of a motion to grant a mistrial. *See Howard*, 621 F.3d at 458. "Where a defendant argues that the district court should have granted a mistrial due to improper testimony, . . . we must first consider whether the challenged testimony was in fact improper." *Id.* "If the district court did not err in admitting the

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

evidence, then the district court could not have abused its discretion in denying the motion for a mistrial." *Id.* at 459 (internal quotation marks and citation omitted). If the testimony was improper, we next determine whether the testimony "was so clearly improper and prejudicial to the defendants that the harm could not be erased by any instruction which the court might give." *Id.* (internal quotation marks and citation omitted).

Defendants first argue that the court abused its discretion when it failed to declare a mistrial after Eric Taylor testified that Milby verbally threatened him. Taylor was a Mid-America investor who had met with Milby in the Kentucky oil fields. Sometime later, Taylor became suspicious that Milby was misusing his investment, and contacted Milby. The prosecutor asked Taylor about his conversation with Milby, and Taylor responded: "Well, just imagine the word 'MF.' And, 'If you keep talking smack and giving me problems, I will have some guys come up there with shotguns and jam it up your A-S-S.' Things like that. . . . And guys will come up with baseball bats and break my kneecaps, stuff like that."

The defendants did not raise a contemporaneous objection to this testimony, and we review its admission for plain error. *See Ham*, 628 F.3d at 804; *United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999). We find none. Milby's conversation with Taylor concerned the alleged fraud at issue and Milby's threatening Taylor in an attempt to end inquiry into it. This evidence is relevant to the commission of the fraud.

Defendants also argue that the testimony constituted impermissible character evidence under Federal Rule of Evidence 404(b). This argument fails because "[w]here the challenged evidence is intrinsic to, or inextricably intertwined with evidence of, the crime charged, Rule 404(b) is not applicable." *United States v. Marrero*, 651 F.3d 453, 471 (6th Cir. 2011) (internal

25

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

quotation marks and citations omitted).   The conversation between Milby and Taylor was directly relevant to Milby's attempt to cover up the alleged fraud.   The threats Milby made against Taylor are an intrinsic part of Taylor's testimony that Milby attempted to cover up the fraud with which he was charged.

Defendants then argue that the court abused its discretion when it failed to declare a mistrial after Eric Taylor testified that Coffman was hiding money in an off-shore bank account.   But as we have already held, *see supra* at p. 16-17, any error in admitting this testimony was harmless at best. And in any event, later in the trial, the jury heard that Coffman transferred over two million dollars of investors' funds to his account in Panama.   There is no "reasonable possibility" "that the evidence complained of might have contributed to the conviction."   *Bell*, 516 F.3d at 447.   The district court did not abuse its discretion in refusing to declare a mistrial.

## H.   Expert Testimony

Defendants argue that the district court erred by allowing Keith Hunter and Ryan Lee, two financial analysts, to testify about the banking data they compiled from bank records.   Defendants maintain that Hunter and Lee were experts as to whom the Government should have provided disclosures under Federal Rule of Evidence 702.   We review for plain error the district court's decision to allow the testimony because defendants failed to preserve the issue for appeal.   *See Ham*, 628 F.3d at 804.

We find no such error.   "Summary testimony is appropriate to aid the jury in the examination of testimony and documents in evidence."   *United States v. Vasilakos*, 508 F.3d 401, 412 (6th Cir. 2007).   Hunter and Lee did not provide expert opinions.   They merely summarized "a large amount of data" without offering "any conclusions as to what the data meant."

26

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

*Faulkenberry*, 614 F.3d at 588.   Moreover, the district court gave an appropriate limiting instruction regarding their summary testimony.   *See Vasilakos*, 508 F.3d at 412.

## I.   Coffman's Sentence

Coffman argues that the district court erred in sentencing him to 300 months in prison.   We review for abuse of discretion both the procedural and substantive reasonableness of the district court's sentencing decision.   *See United States v. Cunningham*, 669 F.3d 723, 728 (6th Cir. 2012).

Coffman challenges first the district court's failure to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," as required by 18 U.S.C. § 3553(a)(6).   Coffman did not raise this objection during sentencing.   When a defendant fails to raise an objection to the sentence after an invitation from the district court to do so, we review the sentence, including the sentencing procedures used by the district court, for plain error.   *United States v. Vonner*, 516 F.3d 382, 385-86 (6th Cir. 2008) (en banc); *see also United States v. Simmons*, 587 F.3d 348, 360 (6th Cir. 2009).   "If the record demonstrates that the sentencing court addressed the relevant factors in reaching its conclusion, the court need not explicitly consider each of the § 3553(a) factors or engage in a rote listing or some other ritualistic incantation of the factors." *United States v. Kirchhof*, 505 F.3d 409, 413 (6th Cir. 2007); *see also United States v. Houston*, 529 F.3d 743, 751 (6th Cir. 2008).   The record reflects that the district court considered the relevant sentencing factors in sentencing Coffman.   We find no plain error in this regard.

Coffman then argues that his sentence was substantively unreasonable because it was disproportionate when compared to sentences imposed in similar cases.   But 18 U.S.C.

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

§ 3553(a)(6) concerns "national disparities," and "the Guidelines themselves represent the best indication of national sentencing practices." *Houston*, 529 F.3d at 752. After considering the guidelines range of 324 to 405 months, the district court varied below the range and sentenced Coffman to imprisonment for 300 months. "[S]imple logic compels the conclusion" that a defendant has a "demanding" task to persuade this court that a sentence below the presumptively-reasonable guidelines range is "unreasonably long." *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008). The extensive fraudulent conduct in this case, the need for general deterrence of such white-collar fraud, and the significant financial impact on the victims necessitate a long period of confinement. The 300-month sentence of incarceration imposed is not substantively unreasonable.

### J.   The Preliminary Forfeiture Order

Coffman next argues that the Government did not prove, by a preponderance of the evidence, that assets included in the Preliminary Order of Forfeiture bore a nexus to the crimes committed by Coffman. We review a district court's factual findings in criminal forfeiture proceedings for clear error and the court's legal conclusions regarding forfeiture de novo. *Warshak*, 631 F.3d at 331.

The indictment contained a forfeiture count based on Coffman's mail fraud, wire fraud, and money laundering offenses. Coffman waived his right to a jury determination of the forfeiture issues. *See* Fed. R. Crim. P. 32.2(b)(5)(A) (providing that party may request "jury be retained to determine the forfeitability of specific property if it returns a guilty verdict"). The district court forfeited all thirteen financial accounts listed in the indictment, the South Carolina condominium, and the yacht, as being involved in money laundering. *See United States v. Coffman*, 859 F. Supp.

28

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

2d 871 (E.D. Ky. 2012).   Rejecting Coffman's claim that non-investor funds were not forfeitable, the court explained that Coffman used the forfeited property to engage in money laundering and that he commingled investor funds with non-investor funds for the purpose of concealing and disguising the nature, location, source, ownership, and control of the fraud proceeds.  *Coffman*, 859 F. Supp. 2d at 877-81.

We find no error in the district court's forfeiture order.  Under the forfeiture statute, "property" that is "involved in" an offense "or any property traceable to such property" is forfeitable.  18 U.S.C. § 982(a)(1).  "Property under the statute includes the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense."  *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) (internal citations and quotation marks omitted).  "Facilitation occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance."  *Id.*

Commingling of fraud proceeds with untainted money as part of concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) permits the forfeiting of the untainted money in certain circumstances.  *Puche*, 350 F.3d at 1153.  "Forfeiture of commingled funds . . . is proper when the government demonstrates that the defendant pooled the funds to facilitate or disguise his illegal scheme."  *Id.*  Commingling "is enough to expose the legitimate funds to forfeiture, if the commingling was done for the purpose of concealing the nature or source of the tainted funds (that is, if the commingling was done to facilitate money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i)."  *United States v. McGauley*, 279 F.3d 62, 76 (1st Cir. 2002).

29

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

The Government provided extensive bank records as well as charts outlining the path of monies through all of the bank accounts, which is sufficient to support a finding that Coffman commingled tainted and untainted funds for the purpose of concealment. "When a sequence of transactions is sufficiently complex, a reasonable juror may infer that the transactions were made for the purpose of concealment." *Warshak*, 631 F.3d at 321 (internal citations and quotation marks omitted). The evidence relative to each account as well as to the condominium and the yacht demonstrates that Coffman commingled tainted and untainted funds to engage in concealment money laundering.

The context of the money transfers also reveals Coffman's intent to conceal. Coffman was aware that Mid-America investors were receiving only small checks from Mid-America; it was he who prepared the investors' tax forms showing the amounts of their losses. After transferring money to his wife and her companies, Coffman moved Global's office to the condominium and signed several of the purchase documents for the yacht. This context supports the conclusion that Coffman was commingling tainted and untainted funds for the purpose of concealing the nature and source of the tainted funds.

Coffman's argument that third party control of the bank accounts shields the accounts from forfeiture cannot succeed here, where the third party controlling the accounts was his wife. The only issue is whether the money laundering conduct "had a link to the assets listed in the indictment." *Warshak*, 631 F.3d at 331. Clearly it did. Coffman orchestrated the transactions and continued to control the money after it was no longer in his name. For example, disguising his continuing control of the funds by transferring money to his wife and her companies, he then moved Global's office to the condominium and signed several of the purchase documents for the yacht.

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

The evidence as a whole was sufficient to prove that he commingled funds with fraud proceeds and made transactions to disguise "the nature, location, source, ownership and control of the proceeds of his fraud." *Coffman*, 859 F. Supp. 2d at 879.

### K.  Substitute Assets and the Preliminary Forfeiture Order

Coffman contends that the district court erred in amending the preliminary order of forfeiture under 21 U.S.C. § 853(p) to include property that Coffman claims belongs solely to Megan.  Because the district court's application of 21 U.S.C. § 853(p) is a question of law, we review this issue de novo.  *See United States v. Parrett*, 530 F.3d 422, 429 (6th Cir. 2008).

A brief background of the statutory scheme for forfeitures is helpful to resolving this issue. When imposing a sentence on a defendant convicted of money laundering or other specified offenses in 18 U.S.C. § 982(a)(1), the district court "shall order that the [defendant] forfeit to the government any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)1.  Further, 18 U.S.C. § 982(b)(1) makes these forfeitures subject to the provisions of 21 U.S.C. § 853, pursuant to which the government may obtain property used in or derived from a defendant's criminal activity.   To prevent a defendant from disposing of this tainted property, 21 U.S.C. § 853(c) makes clear that the government's interest in such property vests "upon the commission of the act giving rise to [its] forfeiture."   Called the "relation back" doctrine, 21 U.S.C. § 853(c) permits the government to recover tainted assets no longer owned by the defendant.  *See United States v. O'Dell*, 247 F.3d 655, 685 (6th Cir. 2001).

Where because of the defendant's actions, the government is unable to locate tainted property subject to criminal forfeiture, it may obtain "substitute property" to satisfy the amount the

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

defendant must forfeit as part of his sentence.   21 U.S.C. § 853(p).   This provision permits the

government to obtain "any other property of the defendant."   21 U.S.C. § 853(p)(2).   The

government's interest in substitute property–unlike its interest in tainted property–does not arise

until "(1) after the defendant's conviction and (2) the court determines the [tainted] property is out

of the government's reach for a reason enumerated in [the statute]."   *United States v. Erpenbeck*,

682 F.3d 472, 478 (6th Cir. 2012).   Thus we have held that the relation back doctrine "extends

only to tainted property."   *Id.* at 477.

In the instant case, the district court ordered Bryan Coffman to forfeit $33,000,000 as a

money judgment.   Arguing that it could not locate assets to satisfy the full money judgment, the

Government filed a motion to amend the preliminary order of forfeiture to include additional

automobiles and real property as substitute assets under 21 U.S.C. § 853(p).   Among the additional

assets the Government sought were five pieces of real property that Coffman had given to his wife

in 2007.   Coffman objected to the Government's motion and argued that, because he did not own

those properties, they could not be "property of the defendant" under 21 U.S.C. § 853(p) and were

not subject to forfeiture as substitute assets.   And because the Government's interest in substitute

assets did not relate back to the time of the criminal activity, Coffman claimed, the Government

could not forfeit the property Coffman had transferred to his wife in 2007.

The district court granted the Government's motion to amend and amended the preliminary

order of forfeiture to include the five additional properties.   It found that Coffman's argument was

based solely on a third party's interest in the property; that the argument must be raised at an

ancillary hearing pursuant to 21 U.S.C. § 853(n); and that only the third party, namely Megan,

32

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

could raise the argument.  The district court held that, "the government may still be entitled to forfeit [Megan's] properties as substitute assets if [it] prove[s] at the ancillary hearing that the transfers [to her] were fraudulent transfers under K.R.S. § 378.010."

Coffman now argues that, because the Government did not prove that the properties in question were his, the properties could not be "property of the defendant" under 21 U.S.C. § 853(p) and were not subject to forfeiture as substitute assets.  This claim fails for several reasons.

First, Coffman cannot assert a third party's interest in substitute property in a direct challenge to a preliminary forfeiture order.  "The forfeiture statute makes it clear that an ancillary proceeding is the sole avenue for a third party to assert an interest in forfeitable property." *Erpenbeck*, 682 F.3d at 480.  In *Erpenbeck*, we rejected the argument that a party to litigation may challenge a forfeiture order by asserting a third party's interest in property to prove that it is not "property of the defendant." *Id.*  The court found that such an argument was "nothing more than an assertion that [the party] has a superior interest in [the property]—exactly the kind of argument that a third-party must make in an ancillary proceeding under § 853(n)." *Id.*

Second, in the district court, the Government argued that Coffman maintained an interest in the properties–and hence they were "property of the defendant" under 21 U.S.C. § 853(p)–because the quit claim deeds executed in late 2007 to his wife were mere fraudulent conveyances aimed at avoiding creditors.  The district court stated that it would hold an ancillary hearing on the issue of Megan Coffman's claim to the properties as well as the issue of whether the properties were fraudulently conveyed.  Coffman has not cited a single case to support the assertion that courts may not void fraudulent transfers as part of ancillary forfeiture proceedings.  Further, if Coffman

33

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

had an interest in the properties, which he denies, then the Government has acquired it.   If he had

no interest in the properties, then the Government has acquired nothing from him.   *See O'Dell*,

247 F.3d at 680.

Finally, the district court acted pursuant to Rule 32 of the Federal Rules of Criminal

Procedure.   Rule 32 contemplates that a district court will issue a preliminary order of forfeiture

and then hold any ancillary proceedings necessary to determine third party rights associated with

the potentially forfeited properties:

> (2) Preliminary Order
> (A) Contents of a Specific Order. If the court finds that property is subject to
> forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the
> amount of any money judgment, directing the forfeiture of specific property, and
> directing the forfeiture of any substitute property if the government has met the
> statutory criteria.   The court must enter the order without regard to any third party's
> interest in the property.   Determining whether a third party has such an interest
> must be deferred until any third party files a claim in an ancillary proceeding under
> Rule 32.2(c).

Fed. R. Crim. P. 32(b)(2)(A).   The court then issues a final order of forfeiture based on findings

from the ancillary proceeding:

> (2) Entering a Final Order.   When the ancillary proceeding ends, the court must
> enter a final order of forfeiture by amending the preliminary order as necessary to
> account for any third-party rights.   If no third party files a timely petition, the
> preliminary order becomes the final order of forfeiture if the court finds that the
> defendant (or any combination of defendants convicted in the case) had an interest in
> the property that is forfeitable under the applicable statute.

Fed. R. Crim. P. 32(c)(2).   The district court followed these procedures and did not err in doing so.

Coffman complains that the ancillary proceeding prolongs the forfeiture process.   As the

Supreme Court noted, however, "[w]hatever the merits of this argument as a matter of policy,

Congress has determined that § 853(n) . . . provides the means by which third-party rights must be

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

vindicated." *Libretti v. United States*, 516 U.S. 29, 44 (1995).

## L.   The Taint Team Procedure

Milby contends that the Government's "taint team" procedure violated his due process rights.   But Milby agreed to this document review process and thus has invited this error, if error there was.   We therefore review this claim under the invited error doctrine, according to which, "when a party has himself provoked the court to commit an error, that party may not complain of the error on appeal unless that error would result in manifest injustice."   *United States v. Demmler*, 655 F.3d 451, 458 (6th Cir. 2011).

In late 2008, federal agents seized documents from Coffman's law office and from the South Carolina condominium while executing search warrants.   A team of Assistant United States Attorneys who were not part of the prosecution team reviewed these documents to determine whether they were encompassed by attorney-client privilege.   The team then classified each document as privileged, possibly privileged, and not privileged.   This "taint team" did not share documents classified as privileged and possibly privileged with those charged with prosecuting Coffman and Milby.   The district court conducted four hearings to consider Milby's privilege claims relating to the items that the taint team had determined were possibly privileged.   The district court made extensive findings regarding the documents identified by the taint team as potentially confidential, finding that most of them were either not privileged or were subject to the crime-fraud exception.

Milby objects to the taint-team procedure employed by the Government, arguing that the district court erred by not holding the Government to more stringent standards in evidentiary hearings.   *See In re Grand Jury Subpoenas*, 454 F.3d 511, 517 (6th Cir. 2006).   In particular, he

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

maintains that the district court should have required the Government to shoulder the "heavy burden of proving that all of the evidence it propose[d] to use was derived from legitimate independent sources." *Kastigar v. United States*, 406 U.S. 441, 461-62 (1972). The district court's failure to do so, Milby complains, is contrary to Sixth Circuit precedent and resulted in a violation of his due process rights.

Milby cannot show any manifest injustice in the district court's conducting of the discovery process. We have said that taint teams are "used primarily in limited, exigent circumstances in which government officials have already obtained the physical control of potentially-privileged documents through the exercise of a search warrant." *In re Grand Jury Subpoenas*, 454 F.3d at 522. "In such cases, the potentially-privileged documents are already in the government's possession, and so the use of the taint team to sift the wheat from the chaff constitutes an action respectful of, rather than injurious to, the protection of privilege." *Id.* at 522-23. Moreover, "because the documents were not the product of compelled testimony, a full *Kastigar* hearing was not required." *Warshak*, 631 F.3d at 294. Such were the circumstances in the case at hand.

Nor did the district court shift the burden of proof to the defense or apply the crime-fraud exception generally, as Milby argues. The Government provided evidence that supported a prima facie showing that a crime or fraud sufficiently serious to defeat Milby's claims of privilege had occurred. *See United States v. Collis*, 128 F.3d 313, 321 (6th Cir. 1997). The court explained the relationship between the communication and the fraud as to each specific document.

Finally, Milby cannot prevail in this claim because he cannot show prejudice. A defendant must demonstrate that the Government made "direct use of the privileged communications, either at trial or before the grand jury," to show prejudice. *Warshak*, 631 F.3d at 294-95; *see also United*

36

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

*States v. White*, 970 F.2d 328, 336 (7th Cir. 1992).   "The attorney-client privilege is a testimonial

privilege. Consequently, so long as no evidence stemming from the breach of the privilege is

introduced at trial, no prejudice results."   *White*, 870 F.3d at 336.   Milby has failed in precisely

this way.   The district court found that almost all of the documents were either not privileged or

were subject to the crime-fraud exception.   Milby has not pointed to a single document obtained in

alleged violation of the attorney-client privilege that the Government introduced at trial.   Thus his

argument fails.

## M.   Closing Arguments

Defendants argue that they were denied their due process rights to a fair trial as a result of

prosecutorial misconduct during closing arguments.   Specifically, defendants argue that the

prosecutor's closing argument improperly shifted the burden of proof to defendants and was

calculated to inflame passion and prejudice in the jury.   Allegations of prosecutorial misconduct

contain mixed questions of law and fact that we usually review de novo.   *United States v. Green*,

305 F.3d 422, 429 (6th Cir. 2002).

We use a two-step inquiry to examine claims of prosecutorial misconduct.   *United States v.*

*Francis*, 170 F.3d 546, 549 (6th Cir. 1999).   First, we determine whether statements by the

prosecutor were improper.   *Id.*   If they were, we determine whether the statements were so

"flagrant" as to warrant reversal.   *Id.*   We consider four factors in determining whether statements

were flagrant:   (1) whether they tended to mislead the jury or prejudice the defendant; (2) whether

the remarks were isolated or extensive; (3) whether the remarks were accidentally or deliberately

made; and (4) the overall strength of the evidence against the defendant.   *Id.* at 549-50.   It is not

enough that the prosecutor's remarks were improper; they must have "so infected the trial with

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

Defendants focus on two statements by the prosecutor during closing argument. First, defendants claim that the prosecutor made an inappropriate statement in an exchange over the idea of good faith. Counsel for Coffman had said in his closing: "And if I have a belief that what my client is doing is legal, and how I've set it up is legal, and I've got a good-faith argument for that belief, I can argue that as long as I want. Lawyers are permitted to make losing arguments." In his rebuttal closing, the prosecutor responded:

> Mr. Romines [Coffman's counsel] says that good faith is a complete defense. And it is, if there is evidence of good faith. But was there any evidence introduced of good faith in this — in this case? Was there any evidence introduced of — is there any evidence of any mistaken conduct or intent?

Coffman's attorney objected, and the court directed the jury to ignore the statement. Coffman's attorney requested an admonition, and the court told the jury: "Members of the jury, the burden of proving the good faith does not rest with the defendant because the defendant does not have any obligation to prove anything in this case. It's the government's burden to prove to you beyond a reasonable doubt that the defendant acted with an intent to defraud." Defendants argue that this exchange was prejudicial because it improperly shifted the burden of proof to defendants and because the prosecutor had conveyed "by virtue of his experience, knowledge and intellect" that the jury must convict. *United States v. Bess*, 593 F.2d 749, 755 (6th Cir. 1979).

Defendants' arguments are not persuasive for several reasons. Even if the statement was improper, it was not flagrant: it was isolated and ultimately did not prejudice the defendants because the evidence against the defendants was strong. *See Francis*, 170 F.3d at 549. Further,

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

the district court immediately provided a curative instruction, telling the jury to disregard the statement. *See United States v. Johnson*, 581 F.3d 320, 330 (6th Cir. 2009). The court's instructions to the jury at the beginning of the trial and the final charge following closing arguments also protected defendants from prejudice. *See United States v. White*, 563 F.3d 184, 194-95 (6th Cir. 2009). Thus the comment by the prosecutor was not flagrant.

Defendants also complain that a second portion of the prosecutor's closing argument, dealing with the jury, was inappropriate. In his rebuttal closing, the prosecutor stated:

> You know, how many times in life have you heard someone say to you on the street, "You know, can you believe what they did, or they're doing, and why doesn't someone do something about it?" And I always ask, "Well, who is the 'they?' Who is the 'somebody' who is going to do something about it?"

This time, Milby's attorney objected, and the court overruled the objection and said, "Please proceed." The prosecutor then concluded his rebuttal argument:

> Thank you. As I said, that question raises the subsequent question of who is the somebody who is going to do something about it? When this first started, it was the SEC and various regulatory agencies, and the Postal Inspection Service, and then my office. But we're done. When I sit down, we are finished. Today, somebody is you. If you don't do it, it doesn't get done. I ask you to do your job. Thank you.

Defendants argue that this statement was improper because comments appealing to the national or local community interests of jurors are impermissible if they are "calculated to inflame passion and prejudice." *United States v. Solivan*, 937 F.2d 1146, 1152 (6th Cir. 1991). Even if the statement was improper, it must have been flagrant. *Wainwright*, 477 U.S. at 181. Applying the factors from *Francis*, we hold that the statement was not flagrant. It did not mislead the jury or prejudice defendants, but pointed out the role of the jury in the instant case. It was isolated, coming after a lengthy trial and consisting of only a few sentences within nearly fifty pages of the

Nos. 12-5574/5611.6090, *United States v. Coffman, et al.*

prosecutor's closing argument.   *See Cockream v. Jones*, 382 F. App'x 479, 486 (6th Cir. 2010).

Finally, while the statement was deliberately made, it followed extensive evidence of defendants'

guilt adduced at a fifteen-day trial.   Even if improper, the statement was not flagrant.

## N.   Cumulative Error

Defendants argue that there was cumulative error because "the combined effect of

individually harmless errors was so prejudicial as to render [their] trial fundamentally unfair."

*United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004).   Defendants have failed to persuade us

of the merit of any of their claims of error.   The record does not demonstrate that defendants were

denied a fundamentally fair trial.   Thus this argument is meritless.

## III.

For the foregoing reasons, we AFFIRM the conviction and sentence of Bryan Coffman and

the conviction of Gary Milby.