**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT LEXINGTON
CRIMINAL ACTION NO. 09-181-KKC-4
CIVIL ACTION NO. 16-7-KKC**

UNITED STATES OF AMERICA                                           PLAINTIFF

**V.**

GARY MILBY                                                              DEFENDANT

**REPORT AND RECOMMENDATION**

Pending is defendant's motion for postconviction relief under 28 U.S.C. §2255.  Doc. 705.  After the United States filed a response (doc. 715) and defendant filed a reply (doc. 717), the Court appointed counsel for defendant (docs. 720, 723) and conducted an evidentiary hearing regarding defendant's allegation that his former counsel forced him to decline a favorable plea offer from the United States. Doc. 724.  After considering the entire record and applicable law, the Court concludes that the §2255 motion should be denied.

### I.  Relevant Factual and Procedural History

The criminal charges and underlying facts thereof are complex and extremely lengthy. By way of illustrative example, the factual section of the United States' response to the §2255 motion is twenty-three pages long.   Therefore, in the interests of judicial economy and as the parties are well aware of the relevant facts and procedural history of this case, the Court will set forth the essential facts by quoting from the Sixth Circuit's opinion on direct appeal:

> After a fifteen-day trial in the Eastern District of Kentucky, a jury convicted Bryan Coffman, a Kentucky lawyer, and Gary Milby, a co-defendant who proudly describes himself as an oil man, of various counts of fraud and money laundering. In a scheme involving shell companies and securities in Kentucky oil wells, Coffman and Milby had defrauded almost 600 investors out of over 36 million dollars during a five-year period. The district court sentenced

1

Coffman to 300 months in prison and Milby to 240 months in prison. Coffman appeals various aspects of his conviction and sentence. Milby appeals his conviction. For the reasons that follow, we **AFFIRM.**

Before we describe the facts of the case, a little background information about securities in the oil and gas industry is helpful. There are legitimate securities investment plans called oil or gas well-drilling programs. A general partner establishes and manages each program, identifies a suitable drilling location, obtains a lease to the mineral rights for that location, and estimates the cost of drilling and production. The general partner then describes the program in a "Private Placement Memorandum" (PPM), which informs investors of the potential risks and profits of the investment. Investors purchase shares in the program, and, if the program is successful, the oil or gas is sold to local distributors. Investors receive profits via royalty checks.

This tale of the oil man and his lawyer began in 2002. In that year, Coffman prepared documents to form a Kentucky oil-drilling company, Mid–America Oil & Gas, for his client, Milby. In 2003, Milby filed for bankruptcy, employing Coffman as his attorney. Later, in 2004, Coffman prepared for Milby documents to form Mid–America Energy, Inc., a Nevada corporation. Mid–America Energy, Inc., (Mid–America) was a management company that provided funds for the drilling operations of Mid–America Oil & Gas.

Over the next several years, Milby enticed potential Mid–America investors with false promises of large investment returns, often taking them to see oil wells he operated in Adair and Green Counties, Kentucky. Milby, however, knew that because a fractured oil reservoir with spotty oil deposits lies beneath Adair and Green Counties, wells in these counties would never produce the large amounts of oil he promised to Mid–America investors.

After Milby received checks from investors, his office wired the money to Coffman, who managed company funds. Coffman aided Milby in misleading investors to believe that wells drilled in Adair and Green Counties would produce extraordinary amounts of oil. Coffman had received a complaint from investors in Texas in 2004 alleging that Milby and Mid–America companies were misusing oil well investor funds and committing fraud. One investor had even said he trusted Coffman because he was a lawyer. But when potential investors contacted Coffman seeking information about Milby, Coffman—knowing that Milby was perpetrating a fraud—vouched for investments in Mid–America and the legitimacy of the operation.

Coffman also directly misled investors. He created Mid–America investor programs and filled out for prospective investors PPMs that included false and misleading information. Investors relied on those PPMs in making investment decisions.

Coffman and Milby utilized forty-two bank accounts in perpetrating the fraud. In 2005 and 2006, Mid–America received $19.3 million from investors but had only $893,000 in revenue from oil sales. Milby and Coffman distributed only a few hundred thousand dollars to Mid–America investors during that period, but

used millions of dollars of the investors' money for personal expenses. Coffman knew that the Mid–America investors were receiving only small checks; he had prepared the investors' tax forms showing the amounts of their losses.

By 2006, investors realized that something was rotten in Mid–America, and one of them lodged a complaint with the Securities and Exchange Commission, which began investigating Milby and Mid–America. Several states launched investigations as well, issuing subpoenas and summonses and filing cease-and-desist orders and contempt orders against Milby and Mid–America based upon state securities fraud and other violations. Milby and Coffman received notices of these actions.

In 2006, Coffman suggested starting an off-shore oil investment company because of the legal trouble Mid–America was experiencing in the United States. He and Milby founded Global Energy Group with a Mid–America investor named Victor Tsatskin, a Canadian who had invested in Mid–America oil wells and realized that his investment was worthless. The three men agreed that Coffman would structure Global like Mid–America and that some of the investment sales would occur in Canada. Coffman planned to pocket a large portion of investors' funds and to mislead investors into believing that an independent escrow agent would be holding those funds. Coffman knew that Milby had no intention of drilling wells for Global investors.

All three men traveled to Toronto, Canada, in 2007 to train several Global salespersons. At those sessions, at which Coffman was present, Milby made false claims about oil production, intending that salespersons would repeat those claims to investors. Coffman later prepared the Global PPM for distribution to Global investors.

Throughout 2007 and 2008, Canadian investors provided funds to Global after Global salespersons promoted the investment. Global had little revenue from oil sales, but took in over $16 million of investors' money. Coffman took about half of it. Not surprisingly, when returns on their investments were meager, investors became suspicious. One group of investors initiated an investigation through a state agency in 2008. When Coffman was deposed in the course of the investigation, he was evasive and misleading.

Coffman engaged in multiple complicated financial transactions with Global investors' money that made tracing the flow of funds difficult. He moved investors' money through several bank accounts into an investment account that he held with his wife, Megan Coffman, and he later transferred his interest in the investment account to Megan. He funneled investors' funds through various bank accounts, including the account of one of Megan's companies, and into an attorney account in order to purchase a South Carolina condominium where his sister-in-law lived and where he later moved Global's office. Coffman signed documents for the purchase of a $1.5 million yacht and, to make the down payment on it, transferred investors' money through a bank account of a company owned by Megan and through an attorney's escrow account. The yacht became the property of another of Megan's companies.

On October 8, 2008, federal agents executed search warrants at Coffman's Lexington law office and at the South Carolina condominium, seizing documents and computer hard drive data. On December 4, 2009, a grand jury returned an indictment charging Milby, Tsatskin, Coffman, and Coffman's wife Megan, with various fraud and money laundering counts.

After a fifteen-day trial in the spring of 2011, a jury convicted both Milby and Coffman of mail fraud, wire fraud, and securities fraud. The jury also convicted Coffman of conspiracy to commit money laundering and money laundering. Megan Coffman was acquitted of all charges. Upon the Government's motion, the court dismissed all charges against the fourth defendant, Victor Tsatskin, after he pleaded guilty in Canada to a securities fraud charge based upon the same fraud scheme, testified against Coffman and Milby, and later received in Canada an imprisonment sentence of three years. Neither Coffman nor Milby testified at trial.

Coffman's advisory sentencing guidelines range for imprisonment was 324 to 405 months, and Milby's was 262 to 327 months. The court sentenced each defendant below his guidelines range, sentencing Coffman to 300 months and Milby to 240 months in prison. Coffman timely appealed his conviction and sentence. Milby timely appealed his conviction.

*United States v. Coffman*, 574 Fed. Appx. 541, 546-549 (6th Cir. 2014) (footnote and section heading omitted).  The Supreme Court denied defendant's certiorari petition in January 2015, and he filed the pending §2255 motion (doc. 705) in January 2016.[1]

Defendant raises two overarching issues.  First, he presents various allegations of ineffective assistance of counsel.[2]  Of particular significance is defendant's claim that that counsel forced/coerced defendant into rejecting a favorable plea offer tendered by the United States.  The Court will relate the crucial testimony presented at the hearing on that issue in detail later in this report and recommendation.[3]  Second, defendant contends the United States

---

1 The United States does not contest the timeliness of the motion.
2 Defendant also claims his attorney's CJA time vouchers were not reflective of the true amount of time spent on defendant's case. However, that is not a proper basis for §2255 relief as the attorney's timesheets have no discernible relevance to defendant's guilt, the fairness of his trial or the propriety of his sentence.
3 The Court appreciates the work of counsel for the United States and defendant, each of whom did a commendable job at the hearing of representing their client's interests with professionalism and efficiency.

4

misrepresented the role played by James Skinner, a receiver charged with collecting debts owed by defendant. Because the issues involving Skinner are more easily resolved, the Court will address them first before turning to the ineffective assistance of counsel allegations.

## II.  Analysis

### A.  Standards of Review

"A prisoner seeking relief under § 2255 must allege as a basis for relief: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006). To be cognizable under §2255, an alleged constitutional error must be of such magnitude as to have "had a substantial and injurious effect or influence on the proceedings." *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999). "Conclusory statements are insufficient to warrant relief under Section 2255." *Combs v. United States*, 2009 WL 943526, at *3 (M.D. Tenn. April 6, 2009). In addition, "[s]olemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

In order to demonstrate ineffective assistance of counsel, a petitioner must make two showings. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A court need not address both prongs if a petitioner fails to make a sufficient

showing on either prong.  *See, e.g., United States v. DeGroat*, 102 Fed.Appx. 956, 959 (6th Cir. 2004).  "The Supreme Court has modified *Strickland's* prejudice prong in the context of guilty pleas, holding that a defendant 'must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and instead would have insisted on going to trial.' *Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)."  *Pough*, 442 F.3d at 966.  Of course, an attorney cannot be deemed ineffective for failing to raise a meritless argument.  *See, e.g., Bailey v. Smith*, 492 Fed. Appx. 619, 627 (6th Cir. 2012) ("*Strickland* does not require counsel to make meritless requests.").

### B. Skinner

Although some of the aspects of defendant's argument are not drafted with precision, as the Court construes the motion defendant argues that Skinner improperly colluded with the United States by arranging for property belonging to defendant to be collected to pay off defendant's debt but, in reality, the property was collected to aid the United States in its criminal investigation of defendant.  In short, defendant contends Skinner helped the United States obtain materials to which it otherwise was not entitled.  *See* §2255 motion (doc. 705), p. 17 ("Skinner used civil process to gather evidence and seize items that the rules of criminal procedure would have safeguarded from governmental intrusion, then provided the items to the Government to advance their criminal case. Skinner became a de facto Government agent and enabled the Government to do indirectly through him what the law will not permit the Government to do directly itself.").

It is questionable whether defendant's arguments raise a cognizable constitutional issue. "To warrant relief for a nonconstitutional error requires a showing of a fundamental defect in the

proceedings that resulted in a complete miscarriage of justice or an egregious error inconsistent with the rudimentary demands of fair procedure." *United States v. Osborne*, 286 F.Supp.2d 891, 895 (E.D. Tenn. 2003) (citing cases). The materials submitted to the Court regarding Skinner do not present a fundamental defect or an egregious error. Alternately, if the Court leniently construes defendant as raising a Fourth Amendment claim, such standalone claims generally are not cognizable in a §2255 motion. *See, e.g., Ray v. United States*, 721 F.3d 758, 762 (6th Cir. 2013) ("Though free-standing Fourth Amendment claims cannot be raised in collateral proceedings under either § 2254 or § 2255, the merits of a Fourth Amendment claim still must be assessed when a claim of ineffective assistance of counsel is founded on incompetent representation with respect to a Fourth Amendment issue."). Also, defendant could have raised claims regarding Skinner on direct appeal.

Finally, defendant's Skinner-based claims are also fatally generic and conclusory. As the United States cogently notes in its response:

> Milby's allegations are general and conclusory. He doesn't explain what evidence was improperly seized and delivered to the Government, why Skinner's actions were improper, how that evidence incriminated Milby or constituted *Brady* material, or whether the Government even used that evidence. Further, he does not explain how this conduct, if exposed earlier, would have resulted in any different outcome at trial.

Doc. 715, p. 30-31. In short, defendant is not entitled to relief on his claims regarding Skinner.[4]

---

[4] Defendant's claims of ineffective assistance of counsel regarding counsel's failure to press the issues involving Skinner before trial are similarly without merit. Counsel initially raised the issue but let it drop when he subjectively concluded that he did not have credible witnesses to continue to press the matter. *See* Statement of Michael Murphy (denoted as an affidavit, though it was not made under oath), Doc. 715-1, p. 4-5.

Whether this Court believes in hindsight that such a strategy was optimal, the choice by counsel was strategic and not objectively unreasonable. Thus, defendant is not entitled to habeas relief, a conclusion reinforced by the fact that the evidence against defendant was overwhelming.

### C.  Ineffective Assistance of Counsel

Before addressing the specifics of defendant's ineffective assistance of counsel allegations, the Court first notes that defendant's allegations are largely doomed by the overarching fact that the evidence against him was overwhelming.  In other words, defendant cannot show prejudice because he cannot show that counsel's alleged errors affected the outcome of the trial in any meaningful ways.  *See, e.g., Goldsby v. United States*, 152 Fed. Appx. 431, 435 (6th Cir. 2005) ("The petitioner must prove that his counsel was so thoroughly ineffective that defeat was snatched from the jaws of victory.") (quotation marks and citation omitted).

Defendant first contends counsel was ineffective for not filing a motion to sever his (Milby's) charges from those of Coffman.  Defendant relatedly laments counsel's decision to pursue a de facto common defense with Coffman instead of presenting defendant's preferred defense whereby Milby was simply following the legal advice he received from Coffman. However, as the United States notes: "Milby now asserts that he should have used the defense that Coffman approved everything and convinced him it was all legal. But no evidence exists that Coffman told Milby it is legal to lie to investors. Even if he said that, it would be unreasonable

---

*See, e.g., English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010) ("When evaluating trial performance, a reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged conduct might be considered sound trial strategy. Under *Strickland's* prejudice prong, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of [the trial] would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. However, even when making strategic decisions, counsel's conduct must be reasonable.") (quotation marks, citations and paragraph break omitted).

for Milby to rely upon it." Doc. 715, p. 26.[5] Moreover, any severance motion would have been futile in light of the fact that the presiding district judge denied Coffman's motion to sever (doc. 304), and counsel cannot be ineffective for failing to file a doomed motion. *See, e.g., Bailey*, 492 Fed. Appx.at 627 ("*Strickland* does not require counsel to make meritless requests.").[6] The futility of a hypothetical motion to sever by Milby's counsel is highlighted by the fact that the Sixth Circuit rejected Coffman's contention on appeal that this Court erred by denying Coffman's severance motion. *Coffman*, 574 Fed.Appx. at 558 ("Even if Coffman did not waive the issue, the district court did not abuse its discretion in refusing to sever the trials of the defendants. . . . The district court provided limiting instructions designed to mitigate any potential for prejudice, and Coffman fails to point to any specific or actual prejudice resulting from the joint trial, let alone any compelling prejudice. Coffman's claim of error is meritless.").

Next, Milby's allegation that counsel was ineffective because he failed to introduce

---

5 Given the deferential nature of review of counsel's strategic choices, the informal linking of trial tactics with Coffman does not entitle petitioner to relief--even if such a strategy in hindsight could theoretically be questioned. *See, e.g., Harrington v. Richter*, 562 U.S. 86, 104 (2011) ("To establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness. A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.") (quotation marks and citations omitted). Defendant's counsel explains in his recent declaration that defendant Milby and Coffman did have similar defenses—namely, reliance upon the alleged disclaimers/warnings in the materials provided to potential investors. Consequently, defendant's counsel and Coffman's counsel coordinated their efforts at trial to make sure that "buyer beware" type of defense was presented fully. Doc. 715-1, p. 2-3. Although not ultimately successful, defendant has not shown that strategy to be objectively unreasonable (particularly in light of the overwhelming evidence against defendant).
6 After noting that the Court had denied similar motions filed by other defendants, Milby's attorney states in his declaration that he declined to seek a severance for strategic reasons (i.e., so he could present a de facto joint defense with Coffman). Doc. 715-1, p. 2.

9

evidence that at least some of the oil wells actually produced oil is unavailing in light of the overwhelming evidence against defendant. Indeed, the oil well scheme resulted in Milby and his co-defendants receiving millions of dollars while only repaying investors minimally.[7] Because defendant cannot demonstrate prejudice, his argument must fail.

Defendant then claims counsel was ineffective for failing to seek to have defendant declared incompetent to stand trial. According to defendant, he has a lengthy history of being treated for mental health/addiction issues and was on prescription medications to treat depression until shortly before trial, when counsel advised him to stop taking the medications. Specifically, defendant contends:

> Milby was also taking a prescription anti-depressant, Paxil. The medication made Milby very drowsy and fatigued. Murphy [defendant's counsel] urged Milby to discontinue using Paxil during the trial, warning him that if the judge saw him sleeping or inattentive she would believe he been out drinking the night before and order him jailed overnight between trial sessions. . . . For whatever reasons, Milby did experience confusion, memory loss, unusually high anxiety and

---

[7] The United States argues in its response (doc. 715, p. 26-27): Milby was on several videotapes soliciting investors in violation of securities laws, making outlandish representations about existing and expected production, promising a 'no risk' investment, lying about reasons production was not forthcoming, selling new programs when old investors had not received the expected dividends, saying that his brother-in-law 'Wilson' was in every project and making $50,000 a week when in fact he had never invested, using the alias, 'Jerry Miller' to thwart the due diligence of investors, and falsely claiming to be a wealthy oil tycoon. He and his cohorts received millions of dollars and the investors received a pittance, if anything at all. No amount of investigation or strategizing could nullify that damning evidence. . . . It was undisputed that Milby went through the motions of drilling, pumping, and selling oil. In fact, as stated above, a financial analyst testified that Mid-America sold over $893,000 worth of oil. However, for Milby to have made good on his sales representations, he would have had to produce hundreds of millions of dollars of oil, a feat he knew was impossible in the fractured reserves of South Central Kentucky. His Mid-America raised over 19 million dollars from investors and paid them a couple hundred thousand. Milby and Coffman pocketed millions. Defendant has not shown cognizable errors in the United States' recitation of the damning evidence arrayed against him.

> hallucinations during his trial. He often felt overwhelmed by everything going on around him and found the only way to control his thoughts was to focus on a particular point, usually on the ceiling, and block out everything else.

Doc. 705, p. 15.  According to defendant, though counsel informed the Court before trial of defendant's mental health, counsel only "presented general concerns without offering any recommendations of what should be done. Murphy did not inform the Court of the psychotrophic [sic] drugs that Milby had been taking, the sudden withdrawal of the drugs, or the possible effects of sudden withdrawal." *Id.*  To attempt to support his argument, defendant has provided two notes from a mental health provider's office regarding defendant's mental health on occasions near the trial.  *See* Docs. 707-2, 707-3.

The transcript of the final pretrial conference shows that defendant's mental health was discussed in detail.  However, no one expressed a belief that there was a legitimate question as to defendant's competency nor did anyone request affirmative relief from the Court.  Specifically, the following exchanges occurred:

> MR. MURPHY: This last matter I'm bringing to the Court's attention because my client has given me permission to do so, your Honor.
> My client advises me, as of around dinnertime last night, that a therapist has told him that they do not think he would be capable of providing any assistance to me in this trial and that he needs treatment to get straightened out or improved before he can withstand the rigors of the trial and assist me.
> THE COURT: What are you asking the Court to do, Mr. Murphy?
> MR. MURPHY: Just providing that information to the Court.
> THE COURT: Well, what do you want me to do with it?
> MR. MURPHY: Well, this was dropped on me. I haven't -- I haven't decided. The only thing I can say, from my lay opinion, is that I've noticed over the last six to eight weeks that my client has seemed to have an increasing amount of depression. *Have I had any problem in thinking or wondering whether he's competent to stand trial? I think he is. He's been able to assist me in the ways that I need.*
> We met in person for an extended period of time, it was the week before last, and I didn't see any need for bringing it to the Court's attention.
> THE COURT: All right. Any comments from the United States?

11

MR. TAYLOR: May we have just a moment?

THE COURT: You may.

(Mr. Taylor and Mr. Duncan confer.)

MR. MURPHY: If I could just add a comment to that, your Honor? I'm prepared to go to trial, and my client has assisted me up to this point. And I don't want to say a client is never of any value to an attorney during the trial, but I think our battle plan is already drawn. If I think that it got critical during the trial with regard to his understanding of the proceedings and all of it, I'll do whatever I thought was appropriate then. But my decision at this point is to take no action. *I'm not making any motions. I don't question his competency*.

THE COURT: All right.

MR. MURPHY: He's just being treated. He's on medication.

THE COURT: All right. And when did he seek treatment for his concerns?

MR. MURPHY: Well over a year ago, prior to the indictment. I've got some medical records that date back into -- the first report I got, I think, was early 2010. And he has been seeing mental health care professionals for approximately five or six years.

THE COURT: All right.

MR. MURPHY: And I was aware -- I was aware of this but I didn't have any concerns, and that's why I didn't file any appropriate motions way back when.

THE COURT: All right. Thank you, Mr. Murphy. Mr. Taylor?

MR. TAYLOR: Well, we're always worried about the record on appeal, and having this jump up in the record is problematic. But we believe that on the representations made that there is insufficient evidence for the Court to take any action at this time.

Trials are stressful. Being accused of criminal offenses is stressful, but we don't hear anything that makes this extraordinary. *And none of my observations nor anyone I know of has related to me any observations of Mr. Milby that would cause us to doubt his competency to assist his counsel during trial.*

Consequently, we do not believe there is sufficient grounds to do anything, other than to proceed to trial.

However, should the Court -- we would not object to the Court inquiring of Mr. Milby ex-parte, in-camera, if the Court feels inclined to do that, just to ensure that a sufficient record is made.

THE COURT: All right. Thank you.

Anything else, Mr. Murphy?

MR. MURPHY: No, your Honor. Thank you.

Doc. 361, p. 38-41 (emphasis added). Similar to his comments at the final pretrial conference, defendant's counsel's recent declaration provides that "at no point" did he question defendant's competency to stand trial. Doc. 715-1, p. 6-7.

12

"A criminal defendant may not be tried unless he is competent. The test for a defendant's competency to stand trial is whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him." *Mallett v. United States*, 334 F.3d 491, 494-495 (6th Cir. 2003) (quotation marks and citations omitted).  In *Mallett*, the Sixth Circuit rejected a §2255 petitioner's claims that his counsel was ineffective for failing to investigate the possibility the defendant was incompetent under facts more indicative of incompetency than are present in the case at hand.  The defendant in *Mallett* underwent psychological testing prior to sentencing and the resulting report showed defendant had suffered a severe brain injury, had limited intelligence and impaired cognitive function and could not efficiently integrate information.  *Id.* at 493-494.  The trial judge ultimately even granted a downward departure due to defendant's diminished mental capacity.  *Id.* at 494.

However, defendant's counsel had not asked for psychological testing of the defendant. The Sixth Circuit held that defendant had not shown prejudice stemming from counsel's (in)action, holding

> First, Mallett has not demonstrated a reasonable probability that a challenge to Mallett's competency to stand trial would have changed the outcome of the proceedings. Nothing in Dr. Pincus's report indicates that Mallett was incompetent to stand trial. Furthermore, after observing Mallett throughout the proceedings, the district court determined that Mallett was indeed competent to stand trial. . . . The key point, however, which is dispositive of this claim, is that Mallett has failed to demonstrate a reasonable probability that the court would have found him incompetent.  In addition, Mallett contends that Dr. Pincus's report does not address whether Mallett was competent to stand trial, and therefore it is possible that a psychological evaluation would provide evidence of incompetency. It is Mallett's burden, however, to demonstrate prejudice, and here this burden has not been met.

*Id.* at 497-498 (citation omitted).

13

Defendant has presented significantly less compelling evidence of his alleged incompetency than did the defendant in *Mallett*. Crucially, defendant has not pointed to any records from a physician or mental health expert opining with precision that defendant was incompetent. On the other hand, defendant's counsel stated contemporaneously at the pretrial conference that he did not believe defendant was incompetent, a view counsel reiterated in his recent declaration.[8] In fact, at the evidentiary hearing defendant's former counsel again reiterated that he "never thought he [defendant] wasn't competent at all. I mean, he was always attune[d] to what was going on, it seemed like to me." Doc. 726, p. 38. In addition, the Court was able to view defendant repeatedly before and during the trial and yet did not express concerns over his competence. Therefore, because defendant has not shown a reasonable probability (or even a reasonable possibility) that the Court would have found him to be incompetent, counsel's failure to move for such a finding does not entitle defendant to §2255 relief.[9]

---

[8] Specifically, counsel's declaration provides in relevant part:
Regarding Mr. Milby's comments about his mental health, counsel notes that he was aware of Milby's treatment by medical health professionals during the months prior to trial. Counsel also knew that Milby had been prescribed medications to address his medical issues. At no point did these problems lead counsel to believe that Milby was incompetent to stand trial. Instead, Milby simply exhibited characteristics often associated with individuals facing the highly stressful possibility of a lengthy period of incarceration. In fact, Milby's anxiety seemed to improve after his prescriptions were changed in the months prior to trial.
Doc. 715-1, p. 6-7.

[9] Similarly, defendant's contention that he was unable to make a rational determination as to whether to accept the plea offer due to his not being properly medicated is unavailing. The plea discussions occurred near the time of the final pretrial conference and trial and, as previously discussed, there is no indication that anyone considered defendant incompetent at that time. Moreover, defendant has not shown that counsel instructed defendant to cease taking his medications. Indeed, though defendant testified at the evidentiary hearing that he had not been taking his medications around the

14

Having resolved the other issues, the Court turns to the factual dispute which necessitated an evidentiary hearing—defendant's claim that counsel forced him to reject a plea offer and go to trial.  To resolve that issue it will be necessary to quote at length from the written record and the testimony presented at the evidentiary hearing.

In his motion, defendant specifically asserts as follows:

Milby also instructed Murphy to seek a plea agreement, and Murphy told Milby he would have to look further into the facts of the case before he could negotiate a plea.

It appears that Murphy's only attempt to form a plea agreement was an e-mail exchange with AUSA Taylor on April 5, 2011. Even at that late date Murphy did not inform Milby of the offer until just before the trial was scheduled to begin. Milby's recollection is that Murphy informed him of the offer when they returned to Murphy's office after the pretrial conference on April 18, 2011. When he presented the offer, Murphy told Milby that they were not taking it because they were going to win the trial, and he warned Milby that if he tried to plead guilty now the judge would order him jailed immediately.

Further, Murphy never informed Milby that during a December 15, 2010 Telephonic Status Conference the Government indicated they had reached an agreement in principle with one of the defendants, Victor Tsatskin, to secure his cooperation and testimony at the upcoming trial. . . .

When Murphy finally presented the Government's offer to Milby, Milby was already experiencing the confusion that was resulting from the withdrawal from his medication. Milby did not understand that he could override Murphy's rejection of the plea agreement. If Milby had known that the decision to accept or

---

time of the plea discussions, his testimony did not contain anything stating that his attorney had advised him to cease taking the medications.  Counsel adamantly denies in his declaration having given such advice.  Doc. 715-1, p. 6 ("Along those lines, counsel never advised Milby to discontinue taking his medications.  Instead, counsel strongly encouraged Milby to continue with whatever course of treatment had been advised by his physicians.").  Moreover, counsel testified on cross-examination that he does not recall being informed by defendant that he was not taking needed medications.  Doc. 726, p. 36 ("Q. Let me restate it. Were you aware that Mr. Milby was not taking certain medications that he needed for various psychiatric conditions? A. He told me about issues along those lines, but I don't recall him ever saying that I should be taking medications for mental health issues that I'm not taking. I don't recall that.").  To the extent there is arguably a factual dispute about whether counsel encouraged defendant to cease taking his medicines, the Court finds counsel to be generally more credible than defendant based upon the Court's observations of each at the evidentiary hearing, defendant's admittedly poor memory and the self-serving and difficult to believe nature of the allegation.

reject the plea offer was his, not Murphy's, . . . he would have accepted the plea offer to avoid the uncertainty of a trial and to try to mitigate the prison term that would result from a conviction.

Doc. 705, p. 12-13.

In its response "[t]he United States concedes that, if, as alleged, Mike Murphy forced Milby to trial over his desire to plead guilty, misadvised him on whose choice that was, and predicted, in the face of this evidence, that an acquittal was likely, that would constitute objectively unreasonable, unethical and deficient representation, the absence of which would have resulted in a significantly different outcome for Milby. It is beyond dispute that Milby should have accepted the government's offer. Therefore, the Court must determine the credibility of this allegation." Doc. 715, p. 2-3.

The Supreme Court has set forth the standards applicable to claims where an attorney's ineffectiveness allegedly caused a defendant to reject a plea offer which should have been accepted. Specifically, the Court held:

In contrast to *Hill,* here the ineffective advice led not to an offer's acceptance but to its rejection. Having to stand trial, not choosing to waive it, is the prejudice alleged. In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.,* that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed. . . . If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it. If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence.

*Lafler v. Cooper*, 132 S.Ct. 1376, 1385-1387 (2012).[10]

---

10 The parties have not argued that the United States would have rescinded its plea offer or that the Court would have rejected it.  The Court therefore

16

A prerequisite to any ineffectiveness based on an inarguably unwise rejection of a plea offer is that a plea offer must have actually been tendered. *See, e.g., Compean v. United States*, 2013 WL 6196517, at *7 (W.D. Ky. Oct. 18, 2013) ("A petitioner such as Compean, who seeks to establish a claim of ineffective assistance of counsel in the context of plea bargaining, consequently must make a double showing—(1) that the prosecutor extended the plea offer and (2) that his or her attorney either failed to communicate the offer to him or misadvised him concerning the advantages and disadvantages of the offer so as to cause the non-acceptance of an otherwise beneficial outcome by a favorable guilty plea. The threshold issue for the Court therefor is whether the Government ever extended a formal plea offer to the Defendant in the first instance. If Compean cannot show by a preponderance of the evidence that the United States ever extended such a formal plea offer for attorney McCall to convey then his Sixth Amendment claim will fail at its inception. Nothing else need be shown for the government to prevail.") (citations and paragraph break omitted).  There was no document officially labelled "plea offer" sent from the United States to defendant's attorney.  Instead, the plea discussions occurred via email exchanges initiated by defendant's attorney.  Under the unique facts of this case, however, those emails were sufficient to constitute a forma plea offer.

Specifically, on April 5, 2011 (about two weeks before the trial began) defendant's attorney sent an email to the United States indicating defendant "has asked me to inquire of you if you have any interest in making him any sort of offer if he capitulates and agrees to cooperate on anything and everything regarding this case." Doc. 707-1, p. 2.[11]  Later that same date the

---

will not address those portions of the *Lafler* test.

11 The emails containing the plea discussions were among the items at issue in defendant's motion to expand the record.  Doc. 707.  The United States'

United States responded: "before we go too far with all of this, I need to know if Milby is really going to flat out admit the fraud. If so, he can be a valuable asset to us and earn some leniency. If he is going to admit it, then we will want to schedule an immediate proffer session so we can evaluate his testimony. If he minimizes the scheme and his role, I'd rather try him." *Id.*

The next relevant document in the record is an email sent from the United States to defendant's attorney the next day which provides in relevant part:

> Mike: Thanks for speaking with us today regarding plea negotiations. You have asked me to set out in writing our offer. You should also understand that what follows is subject to approval by management of this office. If we go much further, I will seek that approval before your client commits. This is simply what I will try to sell management, probation, and the Courts . . . .  We are willing to attempt to get his sentence in the area where he would serve about 8 years with good behavior, meaning a sentence in the 9-10 year range. He can plead to one count of mail fraud resulting in a maximum sentence of 20 years. We can make some concessions about dollar loss and number of victims because of when he was kicked out of the Global phase of the scheme. Together this would reduce OL by 4. We could concede he is entitled to 3 level reduction for acceptance. Subtracting the 2 levels for obstruction of justice gets us down to a total reduction of 9 levels for a net level of 34. This results in a guideline range of 188-235. A motion for downward departure and a recommendation of half off the minimum results in a sentence of 94 months. (As I told you these factual concessions are for plea negotiations only and will not reflect our position if he goes to trial.) A precondition to any concession we make Mr. Milby is that he sit down and make a proffer of truthful testimony that he can provide at trial. It is essential that we believe he is telling us the complete truth. Obviously, any proffer would be 'off the record' and would not be used against him at trial.

*Id.* (paragraph breaks omitted).

Though the email contains some significant contingencies, at a telephonic status conference with counsel in May 2016, the United States stated that it considered the email to be a

---

response to that motion stated that it "has no reason to question their [the documents'] authenticity. Accordingly, the Government does not object to them being placed in the record of this proceeding."  Doc. 711, p. 1.  Therefore, the Court granted as unopposed the motion to expand the record and thus the emails are properly before the Court.  Doc. 712.

formal plea offer.  Doc. 719 ("As reflected more fully on the record, when asked by the Court if it had issued a formal plea offer to defendant Milby the United States responded in the affirmative because it deems the emails sent to defendant's former counsel, which are in the record before the Court, to constitute a formal plea offer.").  Accordingly, the Court will deem the emails to have been sufficient to constitute a formal plea offer.

Before the Court relates the most relevant testimony presented at the hearing, it must be noted that defendant testified at times with hesitancy and imprecision.  Indeed, defendant admitted multiple times that his recall of pertinent events was imperfect.[12]  Specifically, defendant remarked once that he "really can't remember" (doc. 726, p. 7), and later remarked with dismay about how the events in question occurred "a long time ago." *Id.* at p. 8.  Crucially, when asked on direct exam when his former counsel presented him with the terms of the plea offer defendant responded "[o]kay. See, that's where it's a little fuzzy with me." *Id.* at p. 10.[13] Defendant's self-described "fuzzy" memory undermines significantly the reliability/credibility of his testimony.

At the hearing, defendant testified in relevant part as follows:

Q. [by defendant's attorney] Ultimately, at some point, Mr. Murphy brought a proposed plea agreement to you, correct?
A. Yeah. He waited till -- he waited till the month of the trial.
Q. Month of the trial. And was it, you know, within three or four weeks? Was it

---

12 Prior to any testimony being taken, defendant's counsel informed the Court that defendant had not received recently his medications.  However, when asked by the Court defendant was aware of his location and the purpose of the hearing.  Doc. 726, p. 4-5.  The Court takes judicial notice that defendant seemed similarly nervous and fidgety during a prior video conference. When testifying at the hearing, defendant's answers were sometimes rambling but nonetheless were lucid. In short, the Court is confident that defendant was competent and able to participate meaningfully in the hearing despite any alleged failure to receive his medications.
13 On cross-examination defendant later repeated his admission that "[a]gain, okay, I'm fuzzy about all this . . . ."  Doc. 726, p. 19.

three or four days? Approximately, in relation to the trial, when were you advised that there was a plea agreement offered to you?

A. Okay. See, that's where it's a little fuzzy with me. . . .[14]

Q. So you were advised of this plea agreement. You were shown the plea agreement. Was it explained to you?

A. No, sir.

Q. What do you mean?

A. Well, Mr. Murphy knows that because of my mental condition and stuff, my brother had, you know, control over me. And he told -- whenever he saw me, he told me what it was; that it was in the envelope. And he put it in the envelope and told me to take it in and show it to my brother and for us to get back with him.

Q. So is it your testimony that Mr. Murphy did not go through the plea agreement with you, did not read it to you?

A. No, sir. . . .

Q. So you kind of went where I was headed next. Is it your testimony that your attorney, Mr. Mike Murphy, advised you not to take the plea agreement?

A. Yes, sir. He said to trust me; I know what I'm doing here. I've been working with Mr. Lomax, and that they had -- you know, could come up with a defense and stuff and we were going to win.

    You know, I said, you know, I'm too old to take chances. He said, well, don't worry about it. Trust me. Trust me. He kept saying this all through the trial and during the sentencing and everything, trust me. . . .

Q. Were you advised of that by your attorney; that Mr. Tsatskin -- as you were discussing plea negotiations in the plea agreement, were you advised by your attorney that Mr. Tsatskin had decided to cooperate?

A. No, sir, not until the day before the trial, the pretrial hearing.

Q. Would that have been important in your mind to know that, that Mr. Tsatskin had cooperated?

A. Yes, sir . . . .

Q. Two final questions. If you had been advised that Mr. Tsatskin was cooperating, would that have affected your decision regarding the plea agreement?

A. Yes, sir.

Q. Lastly, if your attorney had advised you that the plea agreement was in your best interest, would you have taken the plea agreement?

A. Yes, sir, I would.

Doc. 726, p. 10-16.  On cross examination, the United States asked defendant if his former

---

14 Notably defendant's testimony does not support the contention in his written §2255 motion that counsel did not show him the plea offer until after the final pretrial conference.  Such inconsistencies are another reason why the Court generally does not place great credence in defendant's testimony.

attorney "advised you not to take that [plea] deal" before they went to a restaurant, to which

defendant responded "[a]gain, okay, I'm fuzzy about all this . . . ." *Id.* at p. 19.

Unsurprisingly, defendant's former counsel's testimony was markedly different, as

shown by the following colloquy:

> Q. [by the United States] What was your opinion of the [plea] offer, in light of the evidence as you saw it?
> A. I was surprised that it was that good, to be honest with you. I didn't expect any offer coming from you that would be less than ten years. But, in effect, this is an offer where if he only had to serve 85 percent of that, that he would just be talking down into the seven-to-eight-year range.
> Q. What did you do in response to that offer?
> A. I met with Mr. Milby the very next day, which would be April the 7th.
> Q. Did you have a meeting with him?
> A. I did.
> Q. I'd like for you to give us the who, when, where, and then finally the what that occurred at that meeting.
> A. He came to my office that morning. We met in the conference room. He and I were present. Jarrod Beck, who is a young lawyer that works for me and with me-
> Q. To be clear, where is your office?
> A. My office is in Lexington, Kentucky . . . .
> Q. Okay. Go ahead and tell us what occurred there.
> A. Well, the main theme and the main purpose of this meeting was to discuss this offer with Mr. Milby. And we did that for -- I think I probably just read him, walked him through this e-mail that you sent me and explained that. We talked about the 85 percent rule. We talked about what would be expected of him in return, like being the quid pro quo. In other words, they're not going to offer you this if you don't deliver on your promise to cooperate.
>
> Jarrod and I very, very strongly encouraged Mr. Milby to take this plea. I thought it was a great deal. I had – ever since I had started reviewing the discovery, I thought that the case against Mr. Milby was somewhat overwhelming, and I advised him on numerous occasions that I did not think we would be successful at trial. I just thought there was too much evidence against him. . . .
>
> After probably, I'm guessing a couple of hours, we took a lunch break, and I took all the people over to my favorite restaurant in Lexington, a little Italian place called Giuseppe's, and we had lunch there. And I paid for it with my law office credit card. I don't know why I remember --
> Q. Mr. Murphy, could you speak more directly into the mic? You're kind of trailing off a little bit more.
> A. I paid for everyone's lunch. I can't remember what I had, but for some reason, I

remember Mr. Milby. He was sitting directly across from me. And he just kept talking about how good his oven-roasted salmon was.

　　　Then we went back to the office probably for another hour. He didn't show any -- he just kept saying that I can't do that much time, I can't do that much time.

　　　And then I'm sure when he left -- I can't exactly remember whether I did or not. I probably would have printed him a copy of these e-mails and given him that. But normally, that would be what I would do, would be the same thing if I had a written plea agreement. I would have given a copy to him and told him that, you know, let me know if you change your mind.

Q. All right. Now, Mr. Milby has testified that you did not go over the plea offer, that you put it in an envelope and asked him to take it to his brother for advice. Did that occur?

A. I may have put it in an envelope and said take it and go discuss it with your brother, but I definitely conveyed this offer to him. We went through it line by line.

Q. And what, again, was your advice?

A. My advice was, you need to take this offer. This is a really good offer and it's a lot, lot less time than you're going to get if you go to trial.

Q. And what was his response to that?

A. That he just still felt like that wasn't a good enough deal and he just couldn't do that much time. . . .

Q. Okay. I don't know if you recall, but do you remember the circumstances of Victor Tsatskin deciding to enter into an agreement and whether you communicated that to Mr. Milby?

A. Yes. There was some point in time, I guess shortly before the trial -- I can't remember time-wise -- that you told me that Tsatskin was going to cooperate. He had reached, I think, some kind of deal where he was going to plead guilty to something up in Canada and at least receive some kind of a sentence. I'm not sure how long. And I think you turned over copies of interviews with Mr. Tsatskin. So we had his statement, and it was pretty obvious that he was going to come in and give testimony not only against Mr. Milby, but also against Mr. Coffman.

Q. Did that go into your advice to Mr. Milby to take the deal?

A. I'm sure it would have, yes. I don't specifically recall that; but, yeah, that would have been a big turn of events and that would have been something that I would have conveyed to him.

Q. In your meeting with Mr. Milby there before the lunch at Giuseppe's, did you discuss the strength of the evidence with him?

A. Yes, we discussed the strength of the evidence during the entire pendency of the case. And I told him about my fears that we couldn't overcome, you know, a mountain of evidence like that.

*Id.* at p. 28-33. Though the Court granted defendant's request at the beginning of the trial to

invoke the rule and separate the witnesses, counsel's associate, Jarrod Beck, related the facts

regarding plea discussions in a manner entirely consistent with counsel.[15]

---

15 Specifically, Beck testified in relevant part as follows:
    Q. Now, I want to direct your attention to an issue that's before
    the Court. That has to do with a meeting relating to plea
    negotiations communicated by myself, the prosecutor, to Mr.
    Murphy. Are you aware of that meeting?
    A. I am.
    Q. And could you relate to the Court what you recall -- who,
    what, when, and where -- this occurred?
    A. I remember as we were progressing in preparing for this case,
    that Mr. Milby, at some point, finally expressed some interest in
    potentially resolving the case with a plea.
        And then in response to that, Mr. Murphy, I believe, e-
    mailed you or communicated with you in some way, and you e-mailed
    a plea offer over to him. I believe that was April the 6th of
    2011.
    Q. You've reviewed that paperwork?
    A. I have. I did before I came today.
        And then in response to that, we immediately met with
    Mr. Milby, arranged a meeting the next day on April 7th at our
    law office.
        We actually had some support staff from the public
    defender's office in the Middle District of Tennessee with us
    as well because there was a related prosecution ongoing at
    that time. And we met for a very lengthy period of time.
    Q. Where did you meet?
    A. I'm sorry?
    Q. Where did you meet?
    A. It was at our office in the conference room.
    Q. And where is your office?
    A. Lexington, Kentucky.
    Q. Okay. What happened at that meeting?
    A. We expressed our belief that resolving the case by that plea
    would be beneficial, would be preferable to the likely result if
    we went to trial. And Mr. Milby didn't express any interest in
    taking the deal at that time, but we continued to try to convince
    him that it was the right option.
        Meeting lasted several hours. I can't remember exactly how
    long. But at the end of the meeting, we hadn't actually
    accomplished what we had hoped.
    Q. Did you-all go to lunch together?
    A. We did. We went as a group to a restaurant.
    Q. What restaurant?
    A. It was Giuseppe's restaurant, Italian restaurant in
    Lexington near our office.
    Q. Okay. All right. And what was Mr. Milby's ultimate reaction to
    the offer? Did he express any concerns about the offer?
    A. I think his greatest concern, again, was just the amount of
    time, potentially, that he faced if he pled. He just wasn't
    willing to resolve it in that way just because of the period of
    incarceration he might be facing.
    Q. After the meeting, do you recall any further discussions of

Defendant's sometimes halting, sometimes rambling testimony at the hearing, in short, did not support his written contention that his counsel unilaterally insisted that defendant reject the plea offer. Instead, defendant contended at the hearing only that counsel failed to go over the plea offer and advised defendant to reject it. That testimony is squarely refuted by the testimony of defendant's former counsel and his associate, who each described lengthy meetings during which the plea agreement was discussed and defendant was urged to accept the offer. The Court finds defendant's former counsel's testimony more credible than defendant's, especially considering defendant's admittedly shaky recall of all of the pertinent facts.

Finally, defendant contended that his counsel failed to act effectively by not informing defendant timely of the fact that co-defendant Tsatskin had entered into a plea agreement with the United States. The decision on whether to plead guilty is based upon a myriad of factors, one of which is the strength of the evidence against a defendant. A component of assessing the strength of the United States' evidence against any defendant, including Milby, is whether a co-defendant has reached a cooperation deal. Therefore, defendant should have been informed of Tsatskin's cooperation in a timely manner.

On that discrete point, defendant's former counsel's testimony was somewhat indefinite. Counsel testified that he did not recall the date of the conversation with specificity but that conveying Tsatskin's decision to plead guilty would have been something he discussed with defendant and that Tsatskin's cooperation was a factor in counsel urging defendant to accept the

---

```
        plea negotiations?
        A. No. At that point, that was basically the end of it, because
        after he rejected that deal, he didn't express any interest in
        continuing to negotiate. So we just proceeded forward as we
        needed to do because the trial was coming up relatively soon.
Doc. 726, p. 41-43.
```

plea offer. Defendant, however, definitively stated that he did not learn about Tsatskin's cooperation until the day before trial.

Defendant has not shown when his former counsel learned of the precise details of Tsatskin's cooperation agreement with the United States and how long a period of time passed between counsel gaining that knowledge and counsel passing it along to defendant.[16] Nonetheless, even if the Court were to accept (solely for the sake of argument) that defendant did not learn about Tsatskin's cooperation until right before the trial, defendant has not shown ineffectiveness. Tsatskin's cooperation was only one factor in determining whether to plead guilty and defendant's counsel, and counsel's associate, had urged defendant to plead guilty but defendant insisted he did not want to serve eight years, approximately, in prison.

In hindsight, it is plain that defendant should have accepted the plea offer. However, that is not the standard for obtaining §2255 relief. If it were, any defendant who rejects a plea offer

---

16 During a December 2010 status conference the United States informed the Court and opposing counsel that it had reached an agreement in principle with Tsatskin to cooperate but that the agreement had not been finalized and reduced to writing. Doc. 548, p. 15-16 ("This is the status of our efforts with Mr. Tsatskin. We initiated an extradition proceeding some time ago, began that process. In the meantime, Mr. Tsatskin reached out to us and began negotiating a settlement of the case. It is taking a lot of time and a lot of effort and a lot of hoops we've had to jump through. His -- obviously, his leverage is the extradition proceeding, which by my office's estimate in Washington could take us up to two years in a white-collar case. We have reached an agreement in principle. We're getting it on paper. And that will involve him pleading to criminal charges in Canada. And part of his deal is that he will cooperate with the United States government in this prosecution. That, again, is not on paper at the present time, but it's close to being. And he will also involve an agreed statement of facts, and we'll be providing that to the defense, as well. So all of that, we're well aware of our *Giglio* obligations and we will be providing that when it becomes final. But it's not final yet.") (paragraph breaks omitted). However, though defendant's counsel thus was informed several months before trial that Tsatskin was likely to cooperate, it is not clear when counsel was informed definitively that Tsatskin was cooperating and how much time then expired before counsel discussed that matter with defendant.

and instead goes to trial could obtain habeas relief because, generally, a defendant found guilty at trial will receive a sentence greater than if the defendant had pleaded guilty.  Instead, defendant is required to show that he received ineffective assistance of counsel during the plea bargaining process.  Although the perfect acuity of hindsight may lead to quibbles about whether defendant's counsel's performance was pluperfect, defendant has not met his steep burden to show that counsel's performance was constitutionally deficient.  Instead, the record leads to a conclusion that defendant acted contrary to counsel's advice by rejecting the plea offer.  Therefore, defendant is not entitled to §2255 relief.

### III.  Conclusion

Accordingly,

**IT IS RECOMMENDED:**

Defendant Gary Milby's 28 U.S.C. §2255 motion (doc. 705) should be **denied**.

Particularized objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service or further appeal is waived. *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005); *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), aff'd, 474 U.S. 140, 155 (1985). A general objection that does not "specify the issues of contention" is not sufficient to satisfy the requirement of a written and specific objection. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995)(citing *Howard v. Secretary of HHS*, 932 F.2d 505, 508-09 (6th Cir. 1991)).   Poorly drafted objections, general objections, or objections that require a judge's interpretation should be afforded no effect and are insufficient to preserve the right of appeal.  *Howard*, 932 F.2d at 509.  A party may respond to another party's objections within fourteen days of being served with a copy of those objections.  Fed. R. Civ. P. 72(b)(2).

26

This the 26th day of July, 2016



Signed By:

**_J. Gregory Wehrman_**

**United States Magistrate Judge**